733 So.2d 127 (1999)
STATE of Louisiana, Appellee,
v.
Anthony Tracy JONES, Appellant.
No. 31,613-KA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1999.
*132 Peggy J. Sullivan, Monroe, Counsel for Appellant.
Richard P. Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, CARAWAY and KOSTELKA, JJ.
WILLIAMS, J.
The defendant, Anthony Tracy Jones, was charged by bill of information with two counts of armed robbery, one count of first degree robbery and one count of carjacking, violations of LSA-R.S. 14:64, 14:64.1 and 14:64.2, respectively. Following a trial by jury, the defendant was found guilty as charged on all counts. The state filed a multiple offender bill of information seeking enhanced sentencing of the defendant as a fourth felony offender pursuant to LSA-R.S. 15:529.1. After a hearing, the trial court adjudicated the defendant a fourth felony offender. The trial court sentenced the defendant to serve life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.
The defendant appeals his convictions and his adjudication and sentence as a multiple offender. For the following reasons, we affirm the convictions for armed robbery, carjacking and the multiple offender adjudication and sentence. We vacate the conviction for first degree robbery and enter a conviction of the lesser and included offense of simple robbery. We remand the case to the trial court for sentencing on the remaining convictions.

FACTS
On December 6, 1995, the Circle K convenience store at Mansfield Road and Jewella Avenue was robbed, and the perpetrator also stole a customer's vehicle. The store was robbed again on December 19, 1995 and on December 22, 1995. The defendant was charged with all of the above crimes.
The state presented the following evidence at the trial:
Michael Martin testified that at the end of 1995, he was working as a cashier at the Circle K at Mansfield Road and Jewella Avenue. Martin usually worked the graveyard shift, 11 p.m. to 7 a.m., and he was the only employee on the shift. The store did not have surveillance equipment. On December 6, 1995, the store was robbed while Martin was working. A man came into the store and purchased a beer. As Martin was putting the money into the cash register, the man grabbed him and put a knife to his throat. The man threatened to kill Martin unless Martin gave him the money in the register. The man then came around the counter and took the money from the register. The man told Martin to sit down. The man then cut the phone lines and went outside the store. Money, stamps, and lottery tickets were taken during the robbery.
Martin testified that the robber stole a customer's vehicle after going outside, and Martin called the police from a pay phone in the parking lot. The customer told Martin about the stolen vehicle. The police apprehended a suspect that night, and Martin and the customer were taken to a Circle K on Bert Kouns to look at the suspect. Martin said the suspect looked similar to the robber and was wearing similar clothes. Martin and the customer *133 identified the suspect as the person that robbed them. Martin testified that he was not sure about the identification, but since the customer was sure, he agreed.
On December 19, 1995, the Circle K at Mansfield and Jewella was again robbed while Martin was working. Martin said the second robbery was performed by the same man who performed the first robbery. The man came in the store, displayed a knife, and told Martin to give him the money in the register. When the man came around the counter to get the money from the register, Martin tried to stab him with an ice pick, but he missed. The man then left with the money.
Martin said during both robberies, the robber's knife looked like a steak knife. He said the same person performed both robberies, and the perpetrator was not the suspect that was identified after the first robbery. Martin identified the defendant as the person that robbed the store on both occasions.
On December 22, 1995, the store was again robbed by the same person. This time, the robber had an accomplice. When they came in the store, the man who committed the prior robberies said "I'm back bitch," and the two men came around the counter and grabbed the money from the register. Neither man pulled a weapon, but they just came in and grabbed the money. Martin testified that he did not see a weapon.
Martin told the police that the man who robbed the store on all three occasions had on a dark blue coat, a knitted cap, and dark blue pants. The other man had on a red sweater and red pants. The man who was not at the other robberies threatened to kill Martin if he moved or called the police. Both men took money from the register. Martin testified that the register did not contain very much money, but it contained stamp books and scratched off lottery tickets. He again stated that the same person robbed the store on all three occasions. Martin was shown a knife, but he said it was not the one he saw during the first two robberies.
The 911 tape from December 22nd was played to the jury, and Martin identified his voice on the tape. During this call, Martin told the police the person that robbed the store on this occasion was the same person who had robbed the store on the two previous occasions. Martin stated that on December 19th, he told the police that the robber was the same person who had robbed the store before. Martin said he did not remember seeing a knife on December 22nd. The 911 call on December 22nd was made at 2:03 a.m.
On cross-examination, Martin testified that on December 6th, he described the robber as approximately six feet tall, with a goatee, wearing dark brown gloves, and carrying a steak knife. Martin stated he did not tell the police that the robber was carrying a folding pocket knife. In April 1996, Martin spoke with Officer Parker and informed him that the robber was carrying a 10-inch kitchen knife with a wooden handle. Martin testified that he gave police the same information on December 6th. Martin testified that he did not describe the robber as having a goatee when he spoke with the police officer in April 1996. Martin stated he realized the robber only had a moustache during the December 19th robbery.
Martin testified that he identified Larry Dodson as the robber on December 6th. When he was apprehended, Dodson had a goatee and was carrying a knife. Martin was shown the knife when he identified Dodson and said it looked like the knife used in the robbery. Martin did not think Dodson's knife was a folding knife.
Martin did not see the carjacking, and he said that he did express some doubt to the police when identifying Dodson. In April 1996, Martin told the police that $60 was taken during the first robbery, and he admitted that he had originally said $150 to $200 was taken. He said he changed his story because the store manager told him to change the amount so that no one *134 would know how much money was generally kept in the cash register.
Martin testified that no knife was used in the last robbery. Martin said several things in the police reports were inaccurate, such as the statement that a knife was used in the last robbery and the description of the knife used in the first robbery. Martin admitted that he had read the police reports the day before his testimony. In May 1996, Martin was shown a photographic line-up, and he picked the defendant's photograph from the line-up.
Martin testified that on December 22nd, he told the police that Dodson was innocent. Martin said the robber was dressed the same way on all three occasions. When the police brought the defendant to the store for Martin to look at him, the defendant was handcuffed in the back of the police car. Martin stood about five feet away from the police car. He positively identified the defendant as the same man who had committed all three robberies. On December 19th, Martin described the robber as 5'8" tall and weighing approximately 170-180 pounds.
On redirect examination, Martin said he was not given a list of questions and answers by the district attorney, and he was not coached on how to answer. Martin said that on December 19th and 22nd, he told the police the same person was the robber on all three occasions. On December 6th, Martin found a knife outside the store, and he gave it to the police. Martin identified the knife he found outside the store for the jury. However, he testified that he did not think it was the knife used in the robbery.
James Tate testified that he went to the Circle K on Mansfield Road on December 6, 1995 at approximately 11 p.m. or possibly later. Tate pulled his Nissan Pathfinder up to a gas pump, and as he walked to the back of his vehicle, someone said, "Hey mister, I need your car." He then saw a young man in a long coat and a stocking cap. The man's hand was coming out from underneath the back of his coat, and Tate dropped his keys and ran to the front of his vehicle. Tate testified that the man had something silver and shiny in his hand, and it could have been a gun or a knife. Tate stated he reacted as he did because of fear, and the man was moving as if he was bringing up a weapon.
The man left in Tate's vehicle, and Tate said he did not give the man permission to take the vehicle. The police found the vehicle within an hour of the carjacking. That night, Tate went to another Circle K to look at a suspect. The suspect was dressed in a manner similar to the person who had taken the vehicle, his height was the same, and his face had a similar shape. Tate said he only glanced at the robber's face when the vehicle was taken, and since the suspect looked similar, he told the police the suspect was the person that took his vehicle. Tate said Martin identified the suspect also, but Martin was more hesitant about the identification. According to Tate, Martin said the suspect looked like the robber, but he was not sure.
On cross-examination, Tate said the man was 12-14 feet away when he said he needed the vehicle. Tate said the man brought a shiny object out from behind his back, so Tate ran. Tate said the man did not ask for the keys, and Tate did not know what object was in the man's hand. Tate said the man did not make a verbal threat. Tate described the man to the police as a black male, 5'10", slim, with a short face, and wearing a long coat and a green shirt. Tate said he was sure of the identification at the Circle K at the time because of the suspect's clothing, height, and the shape of his face. Tate said he looked at the suspect for approximately 5-10 minutes.
Charles Owens, a lieutenant with the Shreveport Police Department, testified that he had training in developing fingerprints. He investigated the robbery on December 6, 1995, and as he was driving through the area around the crime scene, *135 he spotted the stolen Pathfinder parked on Southside, about a block from the Circle K. Owens said that a Sergeant Montgomery dusted the outside of the vehicle for fingerprints. Owens attempted to lift fingerprints from the gearshift knob because it had a button that had to be pushed to shift the gears. Owens was able to get a fingerprint off of the gearshift. Owens identified State's Exhibit-9 as the fingerprint that was lifted from the gearshift.
On cross-examination, Owens said he did not attempt to lift a fingerprint from the steering wheel or the car keys. Owens thought the gearshift was the only object on the inside of the vehicle checked for fingerprints, and he said it was the only object he attempted to dust for fingerprints. He said he received the call about the robbery at 1:07 a.m. He did not know the exact time he found the vehicle, but he thought it was within a few minutes of receiving the call.
S. Parker, a corporal with the Shreveport Police Department, testified the robbery on December 6, 1995 occurred at approximately 1:07 a.m. According to Parker, Martin, a store clerk, told the officer that the store was robbed at knifepoint by a black male, twenty to thirty years old, weighing 170-200 pounds. The man had short black hair and a goatee, was wearing dark brown gloves and was carrying a small pocket knife with a 3-4 inch blade. Officer Parker testified that Tate told him that he was approached by a black male and told something to the effect of give up his keys. Parker was shown State's Exhibit-7, and he identified it as the knife that Martin found outside of the Circle K. Martin told the officer that the knife was not used in the robbery. On December 19, 1995, Parker responded to the robbery at the Circle K, and Martin said the robber was the same person as in the previous robbery. On cross-examination, Parker testified that on December 6th, Martin appeared to be shaken up when he gave his statement. On that date, Martin described the knife as a pocket knife with a 3-4 inch blade. Both Martin and Tate told the officer that they could identify the perpetrator. On December 19, Martin said the robber used a steak knife.
Jimmy Miller, an officer with the Shreveport Police Department, testified that Larry Dodson was arrested on December 6, 1995 and was released from jail on December 22, 1995. On cross-examination, Miller said he did not work at the Caddo Correctional Center, and his only knowledge of Dodson's release date came from the jail records.
Pamela Lee, an officer with the Shreveport Police Department, testified that on December 22, 1995, she responded to the robbery at the Circle K at around 2:00 a.m. She was dispatched to the store, and a few minutes later, Sergeant Lockwood came on the air and said he spotted the suspects near Rose-Neath Funeral Home. Lee said she was aware of the prior robberies. When she turned onto Southside from Mansfield Road, she saw two black males running. According to Lee, one male stayed around the ditch on the side of the road, and the other male ran toward the Cell Tech store. Lee stopped by the ditch and set up a perimeter. She stayed there for fifteen to twenty minutes and then was told to go to the store.
Lee spoke with Martin at the store, and he informed her that two black males had robbed the store. One of the black males was six feet tall, weighed approximately 190-200 pounds, and had a mustache. The other was 5'6" or 5'7" and weighed about 170 pounds. Martin told the officer the tall suspect threatened to kill him and appeared to have had a knife. Martin told Lee one of the suspects was the same person that robbed the store previously. Martin said the store lost $30-$35, some stamps, and some scratched off lottery tickets.
On cross-examination, Lee testified that when she responded to the robbery, the only description of the suspects she recalled *136 hearing was the one given by Lockwood as he saw the two men running. She could not recall whether a full description was given. She said Martin told her that the taller suspect appeared to have had a knife in his hand. Lee said she had been to the store on other occasions, but this was the only night she had spoken to Martin about the incident.
Charles Zimmerman, an officer with the Shreveport Police Department, testified that he responded to the robbery at the Circle K on December 22, 1995. After receiving the call, he went to the corner of Southside and Mansfield Road. He heard on the radio that two black males were seen running toward the ditch at Southside and Mansfield Road, so he stopped his vehicle and went down into a ditch that runs under Mansfield Road. While in the ditch, Zimmerman discovered a black male lying in water with weeds pulled over him. Zimmerman said it was a little after 2:00 a.m. when he discovered the man, and it was a very cold night.
Zimmerman drew his weapon and told the suspect to show his hands. Zimmerman handcuffed the suspect and took him to the police car. The suspect was dressed all in black, including a long black jacket. Zimmerman searched the suspect and found a knife and some change in the pocket of the suspect's jacket. He identified State's Exhibit-6 as the knife found on the suspect.
Zimmerman was advised over the radio that some stamps and lottery tickets were stolen from the store, and he searched the defendant further. Zimmerman felt a bulge on one of the suspect's legs, between the knee and the ankle. Since the suspect had on two pairs of pants, Zimmerman cut the suspect's pants open with a knife in order to determine what was causing the bulge. Zimmerman said he could not get to what was causing the bulge by any other means. After the pants leg was cut, the stamps and the lottery tickets fell out. The suspect was placed in the police car and taken to the Circle K. At the store, the clerk positively identified the suspect as the robber. At trial, Zimmerman identified the defendant as the suspect found in the ditch.
Zimmerman said he did not remember receiving a description of the clothing worn by the suspects. He just remembered hearing that two black males were seen running toward Rose-Neath Funeral Home. According to Zimmerman, he did not see anyone running when he arrived, and he did not see a weapon on the suspect while the suspect was lying down.
Zimmerman said the knife was found in the inside pocket of the suspect's jacket. Zimmerman said the suspect originally was handcuffed and put in the police car because of safety concerns. Zimmerman said he did not cut the suspect's pants until after telling Officer Lee about recovering the knife and the change. At this point, she told him what else was stolen, and he continued the search. The suspect was then put in the police car and taken to the store. Zimmerman said the suspect was taken out of the car for Martin to look at him.
Amy Crietzberg, an officer with the Shreveport Police Department, testified she works with fingerprint records. She identified a fingerprint card State's Exhibit-11(S-11) with the defendant's name and fingerprints on it. She also identified the defendant's right thumbprint which was on his arrest sheet from the December 1995 robberies.
Owen McDonnell, a deputy with the Caddo Parish Sheriffs Department, testified he was assigned to the crime scene investigations unit and had been comparing fingerprints since 1986. McDonnell said he looked at State's Exhibit-9 (S-9) at the request of Sergeant Rogers of the Shreveport Police Department. S-9 is a latent print impression with a case number on it. McDonnell said he compared the impression (S-9) with the inked impressions on another card with the defendant's name on it (S-11).
*137 Out of the presence of the jury, the defendant was fingerprinted by McDonnell. These prints were labeled as State's Exhibit-12. When the jury returned, McDonnell said he compared the prints in S-11 and in S-12, and the same person made the impressions. McDonnell then said he compared those prints to S-9, and all of these prints were made by the same person. McDonnell said S-9 was a card with "inside of shift button" written on it, and the thumbprint on the card was made by the person he fingerprinted in court.
On cross-examination, McDonnell said the print on S-9 was not a full print, as it only had part of the thumb. McDonnell said there was some smudging on the print, but not enough to prevent a reading. After McDonnell's testimony, the state rested.
The defendant testified on his own behalf. He testified that he knew nothing of the robberies on December 6th or 19th. According to the defendant, at approximately 1:00 a.m. on December 22nd, he was walking on Jewella Avenue and going to a store. He was in the area because he was staying with his sister on Letha Lane. While walking, he met a man who asked him for a cigarette. The man asked the defendant where he was going, and when the defendant said he was going to the store, the man said he was going that way and they walked together. The defendant testified that he was suspicious of the man, but he continued to walk with him.
According to the defendant, when he walked into the Circle K with the man, the clerk, Martin, was standing at the cash register with it open. The defendant said the man pushed Martin out of the way and grabbed the money. The defendant asked the man what he was doing, and the man said, "Let's go." The defendant claimed that since he was on parole, he had no other choice but to run. The defendant testified that when they made it to the funeral home he got "greedy" and asked the man what had he taken. He further testified that the man gave him some lottery tickets, stamps, and change. He admitted that when the police came, they both ran. The defendant said he fell into a ditch and just lay there when he saw all of the police cars. He stayed there until he was found by the police officer and handcuffed. Then, he was taken to the store and identified.
The defendant testified that he did not have anything to do with the robbery on December 6th, and his fingerprints were not in Tate's vehicle. He admitted that he had convictions for possession and distribution of cocaine and an arrest for theft. The defendant testified that he never committed an armed robbery.
On cross-examination, the defendant admitted that in April 1991, he pled guilty to the attempted distribution of cocaine and received a suspended sentence. He also admitted violating his probation. The defendant admitted pleading guilty to distribution of cocaine in October 1991 and to possession of cocaine in July 1994. The defendant testified that only four months passed between his release from prison for his last offense and his arrest for the present offenses.
The defendant said he "took the stuff" on December 22nd because he became greedy and thought that they had gotten away. He testified that he had never seen the man that robbed the store before that night. He also testified he was carrying a knife for his protection, but the man that he was with did not have a knife.

DISCUSSION

Assignments of Error Nos. 1 and 4
By these assignments, the defendant contends the evidence was insufficient to support his convictions of the crimes charged.
When the assignments include the sufficiency of the evidence to convict and other errors, the reviewing court is directed to review the sufficiency assignment *138 first. State v. Hearold, 603 So.2d 731 (La. 1992).
The relevant inquiry when reviewing a conviction for the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard, initially enumerated in Jackson, and now legislatively embodied in LSA-C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937. For circumstantial evidence to sustain a conviction, upon assuming every fact to be proved that the evidence tends to prove, the evidence must exclude every reasonable hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
Under Jackson v. Virginia, supra, the state bears the burden of negating any reasonable probability of misidentification in cases where the defendant asserts he was not the perpetrator or he remains silent. State v. Powell, 27,959 (La.App.2d Cir.6/26/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847. The appellate court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Cotton, supra.

Armed Robbery:
After reviewing the entire record, we conclude that the evidence supports the convictions for armed robbery. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64.
The Circle K clerk, Michael Martin, identified the defendant as the man that robbed the store on all three occasions. Martin stated that on December 6th and 19th, the defendant used a knife to commit the robberies. Also, the defendant's thumbprint was found in the vehicle stolen from the Circle K following the robbery on December 6th.
While Martin initially identified Larry Dodson as the perpetrator of the December 6th robbery, both Martin and Tate testified that Martin's identification of Dodson was somewhat hesitant. After both the December 19th and 22nd robberies, Martin indicated to the police that the same perpetrator committed all three robberies. When Martin was shown the defendant following the December 22nd robbery, Martin made a positive identification of the defendant as the perpetrator of all three robberies. So while Martin's credibility was called into question because of the identification of Dodson and because of some of the discrepancies between his recollection of the robberies and the police reports, the jurors were entitled to believe Martin when he identified the defendant as the perpetrator of all three offenses.
The defendant also alleges that Martin's identification was tainted because the defendant was presented to Martin in a one man "show-up" following the last robbery. We disagree. Despite the existence of a suggestive pre-trial identification, an in-court identification may be permissible if there does not exist a very substantial likelihood of irreparable misidentification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). If there is a suggestive identification procedure, the courts must look to several factors to determine, from the totality *139 of the circumstances, whether the suggestive identification does present a substantial likelihood of misidentification. Id. These factors include: (1) the opportunity of the witness to view the criminal at the scene of the crime; (2) the witness's degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, supra. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. Id.
We note that Martin saw the robber on three separate occasions. While the encounters were brief, the two men were close together, so Martin had the opportunity to get a good look at the perpetrator. Since the robber was armed with a knife during the first two robberies, Martin was mentally "on guard" during the third robbery to pay close attention to the perpetrator and to what he was doing. Further, Martin testified that on December 19th, he recognized the perpetrator as the same person who committed the first robbery while the perpetrator was still in the store. Martin's descriptions of the robber, while not detailed, were fairly consistent and accurate. After both the second and third robberies, Martin indicated the same man committed each offense.
Moreover, Officer Zimmerman indicated that Martin made a positive identification of the defendant following the December 22nd robbery. Martin testified that he was positive the defendant was the person that robbed the store on all three occasions. While the time frame is not certain, Martin seems to have identified the defendant within less than thirty minutes of the last robbery.
While we agree that a one man line-up within a few minutes of a crime is suggestive, after considering the number of times Martin had to view the perpetrator of the armed robberies, his identification of the defendant does not present a substantial likelihood of misidentification. The evidence presented at trial was sufficient to support the defendant's convictions for the armed robberies which occurred on December 6, 1995 and December 19, 1995.

Carjacking:
The evidence was also sufficient to support the defendant's conviction of carjacking. Carjacking is the intentional taking of a motor vehicle belonging to another person, in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, by use of force or intimidation. LSA-R.S. 14:64.2.
The victim, James Tate, testified that after he pulled into the Circle K to get gas, a man approached him and said he needed Tate's vehicle. Tate said the man brought his hand out from underneath the back of his coat, and the man had a silver and shiny object in his hand. At this point, Tate dropped his keys and ran. The man then took the vehicle. Although Tate could not identify the object in the man's hand, he testified the object was produced in a threatening manner. Under the circumstances, the jury could have rationally concluded that the defendant took the vehicle through the use of intimidation.
Further, although Tate identified the wrong man on the night of the carjacking, the evidence was still sufficient to prove beyond a reasonable doubt the defendant was the perpetrator of the carjacking. The state presented credible evidence that the defendant's thumbprint was found on the vehicle's gearshift. Evidence of the thumbprint, in addition to Martin's testimony concerning the armed robbery, was sufficient to show the defendant to be the perpetrator of the crime. The evidence is sufficient to support the defendant's conviction for carjacking.

First Degree Robbery:
We do not find that the evidence presented at trial was sufficient to prove that the defendant was guilty of first degree robbery. First degree robbery is the taking of anything of value belonging *140 to another from the person of another, or that is in the immediate control of another, by the use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon. LSA-R.S. 14:64.1. To prove first degree robbery, the state is required to prove that the offender induced the subjective belief in the victim that he was armed with a dangerous weapon and that the victim's belief was objectively reasonable under the circumstances. State v. Fortune, 608 So.2d 148 (La.1992). Direct testimony from the victim that he believed the defendant was armed or circumstantial inferences arising from the victim's immediate surrender of his possessions in response to the defendant's threats may support a conviction for first degree robbery. Id.
Martin identified the defendant as one of the perpetrators of the third robbery. In addition, when the defendant was discovered by the police, he had change, stamps, and lottery tickets on his person, and these were the types of items stolen from the store. Also, the defendant admitted taking part in the robbery, although he stated it was not his idea.
Martin testified that on December 22nd, the defendant and another man robbed the store. Martin said he did not see a weapon or anything that he thought was a weapon during the robbery as the men just came in the store and took the money from the register. Martin said the defendant said, "I'm back bitch," and the other man threatened to kill Martin if he called the police. However, neither the prosecutor nor the defense counsel asked Martin if he thought one of the robbers was armed, and Martin never said that he thought one of the robbers had a weapon or that either robber did anything to make him believe a weapon was present. Since Martin did not say that he thought the defendant or his accomplice was armed, the evidence was not sufficient to support the conviction for first degree robbery. There was no showing by the state that the victim believed one of the robbers was armed with a dangerous weapon. However, considering the defendant's statement upon entering the store and the threat made by the other robber, the evidence was sufficient to support a conviction for simple robbery since these statements could be considered intimidation. LSA-R.S. 14:65. Thus, we vacate the first degree robbery conviction and enter a conviction for simple robbery.

Assignments of Error Nos. 2 and 3

Motion to suppress:
In this assignment, the defendant alleges the trial court erred in denying his motion to suppress. The defendant filed a motion to suppress the evidence recovered from the defendant on the night of his arrest and the identification made by Martin. After a hearing, the trial judge denied the motion.
At the hearing, Officer Zimmerman was the only person to testify. His testimony concerning the chain of events on December 22nd was basically consistent with his testimony at trial. However, at the hearing, Zimmerman stated the defendant was not searched until after being identified by the clerk. At trial, Zimmerman testified that the defendant was searched before being taken to the store. Also, at the hearing, Zimmerman stated he had a rookie partner with him that night, and at trial, he said he did not.
The defendant argues that he was arrested by Zimmerman at the time he was handcuffed and that probable cause to arrest did not exist at the time. Thus, the defendant claims the subsequent search was invalid. We disagree. Regardless of the actual moment of the defendant's arrest, the search was valid under the circumstances of this case.
While Zimmerman stated, at the hearing and at trial, that the defendant was not arrested until after he was identified by Martin, the officer's statements are not determinative of when the arrest occurred. *141 Even though the technical arrest occurs after the search, a defendant may, for the purposes of constitutional justification, have been arrested before a search was commenced. State v. Melton, 412 So.2d 1065 (La.1982). An arrest occurs when the circumstances indicate an intent to effectuate an extended restraint on the liberty of an accused, rather than at the precise moment the officer tells an accused he is under arrest. State v. Simms, 571 So.2d 145 (La.1990). If an arrest is justified before the search, it is not unreasonable for the search to be made before, instead of after, the arrest. State v. Melton, supra.
The defendant appears to have been under arrest when handcuffed by Zimmerman. The defendant's liberty was restrained at this time, and he was not free to leave the scene. After being handcuffed, he was placed in the police car and taken to the crime scene for identification. Regardless of whether the defendant was searched before or after being placed in the police car, the circumstances indicate that he was, in effect, under arrest when handcuffed by the officer. Although the arrest occurred at this time, the arrest was valid, as well as, the subsequent search.
A warrantless search and seizure is presumed unreasonable unless it is justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Talbert, 449 So.2d 446 (La.1984). The burden of proof is on the state to affirmatively show that one of the exceptions applies. LSA-C.Cr.P. art. 703(D); State v. Talbert, supra.
One exception to the warrant requirement is a search incident to a lawful arrest made of a person and the area in his immediate control. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). When a lawful arrest is made on probable cause, a warrantless search incident thereto of a person and the area in his immediate control is permissible. State v. Andrishok, 434 So.2d 389 (La.1983). A peace officer may lawfully arrest a person without a warrant when he has reasonable cause to believe that the person arrested has committed an offense. LSA-C.Cr.P. art. 213. Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of ordinary caution in the belief that the person to be arrested has committed a crime. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760.
Under the circumstances, Zimmerman had probable cause to arrest the defendant when the defendant was found. Zimmerman was responding to a robbery at the Circle K, and he knew about the prior robberies at the store. He received a radio communication stating the suspects were seen running toward the area where he searched. Zimmerman found the defendant about a block away from the crime scene, hiding under water in a ditch on a cold night in December. Besides the fact that the defendant was lying in a ditch of water on a cold night, he was also dressed in dark clothing, and he matched the general description of the perpetrator of the prior offenses. Considering these circumstances, Zimmerman's knowledge was sufficient to justify a man of ordinary caution in the belief that the person to be arrested had committed a crime. Therefore, there was probable cause for the arrest. Since the defendant's arrest was valid, then the subsequent search was valid.
An appellate court, in reviewing a ruling on a motion to suppress, may consider not only the evidence presented at the motion's hearing, but also the evidence presented at trial. State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366. Zimmerman presented credible testimony concerning his initial contact with the defendant, and under the circumstances in which Zimmerman found the defendant, the search was valid regardless of whether *142 the search occurred before or after the identification by Martin. As the police had probable cause to arrest the defendant when he was found, the search of the defendant's clothes was valid.
Moreover, the evidence obtained in the search was admissible under the inevitable discovery rule. When the evidence in question would inevitably have been discovered without reference to any police error or misconduct, there is no nexus sufficient to provide a taint, and the evidence is admissible. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); State v. Nelson, 459 So.2d 510 (La.1984). Thus, all of the evidence seized from the defendant appears to have been admissible, as does the identification by Martin. These assignments lack merit.

Assignments of Error Nos. 3 and 5

Mistrial:
By these assignments, the defendant alleges the trial court erred in denying his motions for mistrial. The defendant claims he was denied a fair trial because on two occasions, he may have been seen by a "couple of jurors" while in handcuffs. On both occasions, an evidentiary hearing was held to determine what the jurors may have seen; however, the trial judge did not allow the questioning of the jurors at either hearing.
The defendant made the first motion for a mistrial during voir dire. He alleged that two prospective jurors saw him in handcuffs while being transported from an elevator to the courtroom. William Dick, a deputy with the Caddo Parish Sheriff's Department, testified that he was one of the officers transporting the defendant to the courtroom. As the deputies and the defendant left the elevator, two men were standing in the hall by the other elevators, which were about 50 feet from the jail elevator. The men were talking, and one was facing the deputies and the defendant. The deputy did not know if either of the men looked at the defendant.
The defendant's hands were cuffed in front of him, and he had on leg braces which were not visible. The deputy stated the defendant was in civilian clothing, and it only took a few seconds to get from the elevator to inside the courtroom. The distance from the elevator to the courtroom door is approximately twelve to fifteen feet. Deputy Heath and Deputy Wilson both testified to the same facts as Deputy Dick, and neither man knew if the men in the hall saw the defendant. The trial court denied the motion for mistrial.
The defendant again moved for mistrial during the trial when he claimed one of the jurors saw him in handcuffs as he was being taken from the courtroom. Deputy Pearlena Jackson, a bailiff, testified she was not in charge of transporting the defendant from the courtroom, but she was attempting to clear the hallway so the defendant could be brought out. As the defendant was being brought out of the courtroom, one of the jurors walked out of the restroom. Jackson said the distance from the bathroom to the door of the courtroom is approximately ten to twenty feet. She did not know if the juror saw the defendant, but she felt the juror was in position to see the defendant. The defendant was handcuffed when he was in the hall, and he had on leg braces which were not visible.
Deputy Cornell Wilson transported the defendant across the hall, and he did not know whether the juror saw the defendant. Wilson said the defendant's handcuffs were not covered, but the defendant was holding a legal pad in his hand. According to Deputy Wilson, it took them approximately ten to twelve seconds to cross the hall into the elevator.
Deputy Frankie Heath transported the defendant across the hall, and she told the juror to step back as he walked out of the restroom. She said the juror stepped out of the restroom as they walked out of the courtroom, and she did not know whether the juror saw the defendant.
*143 Deputy Nathan Forch, part of the security detail for the courthouse, stated the deputies and the defendant were about halfway into the hall when the juror came around the corner. Forch did not know whether the juror saw the defendant's handcuffs. However, the deputy said it would have been difficult for the juror to see the defendant's hands because from the juror's location, he should have only been able to see the defendant's back. Deputy Forch also testified that the juror was approximately ten to twelve feet away from the defendant. The trial judge denied the motion for mistrial. The judge offered to admonish the jury, but the defendant declined the offer.
Absent exceptional circumstances, a defendant before the court should not be shackled, handcuffed, or garbed in any manner destructive to the presumption of innocence or detrimental to the dignity and impartiality of the judicial proceedings. State v. Plater, 26,252 (La. App.2d Cir.9/21/94), 643 So.2d 313. For a finding of reversible error, the record must show an abuse of the trial court's reasonable discretion resulting in a clear prejudice to the accused. Id. The momentary use of restraints for the limited purpose of transporting the accused does not mandate a mistrial. State v. Otis, 586 So.2d 595 (La.App. 2d Cir.1991).
Mistrial is a drastic remedy which is warranted only when substantial prejudice would otherwise result to the accused. State v. Harris, 28,517 (La. App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975. The trial court has the discretion to determine whether a fair trial is impossible or whether a jury admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed absent an abuse of discretion. State v. Powell, 598 So.2d 454 (La.App. 2d Cir.1992).
Even if the defendant was seen by the jurors on both occasions, the trial judge did not abuse his discretion in denying the motions for mistrial. At worst, the defendant was seen walking between the elevator and the courtroom while wearing handcuffs. If the defendant was seen in this condition, he was only viewed for a few seconds. Because he was in transport to or from the courtroom when the alleged viewing occurred, we do not find that seeing him handcuffed would have produced any prejudice in the jurors. Under the circumstances, the defendant has not proved any prejudice. The trial judge did not abuse his discretion in denying the motions for mistrial. These assignments lack merit.

Assignments of Error Nos. 8 and 10

Admissibility of knives:
By these assignments, the defendant contends the trial court erred in admitting two knives into evidence. The defendant challenges the relevancy of the knives. State's Exhibit-6 (S-6) was the knife recovered from the defendant on the night of his arrest. State's Exhibit-7 (S-7) was the knife Martin discovered outside the store after the first robbery.
Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401; State v. Warren, 28,889 (La.App.2d Cir.12/11/96), 712 So.2d 500. The trial court is vested with discretion in determining the relevancy of evidence, and its ruling will not be disturbed on appeal in the absence of a clear showing of an abuse of discretion. State v. Warren, supra.
The knife admitted into evidence as S-6 was relevant evidence since it was found on the defendant when he was arrested. Even though Martin testified that the knife was not the one used in the first two robberies and that no weapon was produced in the last robbery, the knife was *144 relevant to show that the defendant was armed at the time of his arrest. The judge did not abuse his discretion in admitting S-6 into evidence.
Even though the state did not prove that S-7 was connected to the robberies, the knife was admissible because its existence was disclosed by defense counsel when questioning Martin. Since defense counsel mentioned the knife in the presence of the jury, the prosecution had the right to introduce it into evidence. Moreover, the admission of S-7 was not prejudicial to the defendant. None of the witnesses connected the knife to the defendant or to any crime. These assignments lack merit.

Assignments of Error Nos. 3 and 9

Discovery violation:
By these assignments, the defendant contends the trial court erred in allowing Deputy McDonnell to testify concerning the defendant's fingerprints because the prosecution did not submit a report from McDonnell to the defense. Prior to trial, the defendant made a request for the production of any scientific reports in the possession of the prosecution. Although a report from McDonnell was not given to the defendant, the prosecution gave the defendant a report from the Crime Scene Investigations Unit of the Shreveport Police Department which indicated that the print found on the inside of Tate's vehicle belonged to the defendant. The defendant acknowledged the receipt of these results and even requested funds so that his own expert could examine the prints.
LSA-C.Cr.P. art. 719 requires the state to provide the defendant with copies of test results that are in the possession, custody, control or within the knowledge of the district attorney and intended for use at trial. State v. Rhodes, 29,207 (La.App.2d Cir.1/22/97), 688 So.2d 628. Non-disclosure does not warrant automatic reversal, but where the defendant is lulled into a misapprehension of the strength of the state's case as a result of the non-disclosure, the defendant is entitled to reversal. Id.
The defendant was not prejudiced because he did not receive a report on the examination performed by Deputy McDonnell. Since the defendant was aware of the fingerprint evidence, he was not lulled into a misapprehension of the strength of the state's case by the non-disclosure of a written report. These assignments lack merit.

Assignment of Error No. 11

Habitual offender adjudication:
The defendant alleges the trial court erred in adjudicating him a fourth felony offender. Following his convictions, a multiple offender hearing was held, and the defendant was found to be a fourth felony offender based upon guilty pleas entered in April 1991, October 1991, and July 1994. The defendant alleges that the prior guilty pleas are defective because of insufficient plea colloquies and that the records submitted to prove the prior convictions were not properly certified.
The defendant alleges the guilty pleas entered on October 1991 and July 1994 are defective because the trial court did not ascertain his capacity to understand the rights he was surrendering. He alleges he was not adequately informed of his privilege against self-incrimination during any of his guilty pleas. In addition, the defendant claims he was not advised of his right to compulsory process or his right to appeal.
In order to enhance a sentence with a prior guilty plea, the state bears the burden of proving the guilty plea was constitutionally entered, and to meet this burden, the state must introduce a contemporaneous record of the Boykin examination which demonstrates the plea was free and voluntary and which includes a waiver of the Boykin rights. State v. Shelton, 621 So.2d 769 (La.1993). *145 If the defendant denies the allegations of the bill of information, the burden is on the state to prove the existence of the prior guilty pleas and that the defendant was represented by counsel when they were taken. Id. If the state meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. Id.
In State v. Jones, 28,929 (La.App.2d Cir.4/2/97), 691 So.2d 858, this court went through prior cases discussing the requirements for a valid guilty plea. This court found that for a guilty plea to be valid, the record must show that the defendant knowingly and intelligently waived his Boykin rights and that he understood the nature of the offense with which he was charged and the permissible penalty range for that offense. Id.
Further, in State v. Jones, 30,593 (La. App.2d Cir.9/26/97), this court found that the failure of the trial court to inform the defendant entering a guilty plea of his right to appeal within five days does not make the guilty plea invalid for use as a predicate offense in a subsequent multiple offender proceeding.
The defendant's prior guilty pleas are valid. The defendant was represented by counsel at all three guilty pleas. He was adequately informed of his Boykin rights when entering the pleas, including his right against self-incrimination. He was informed of the nature of the offense with which he was charged and of the possible sentence range during each plea. The defendant's allegations as to the deficiencies in his guilty pleas are without merit.
The defendant also claims that the bills of information from his prior convictions were not properly certified. The defendant contends that any information below the seal is not certified, and since the seal is above the fingerprints on each of the bills of information, the fingerprints are not properly certified. However, the defendant has not cited any authority which supports his allegation, and none has been found. The bills of information were properly certified.
We also note that the conviction used as the defendant's fourth felony conviction was the armed robbery which occurred on December 6, 1995. However, the record does not indicate that the defendant was ever sentenced for the carjacking conviction, the first degree robbery conviction, or the other armed robbery conviction. Thus, we must remand the case to the trial court for sentencing as to these convictions. As for the habitual offender adjudication, the trial court's adjudication of the defendant as a fourth felony offender and his sentence is affirmed. This assignment lacks merit.

Assignment of Error No. 12

Excessive sentence:
The defendant alleges the trial court failed to comply with LSA-C.Cr.P. art. 894.1 and in imposing an excessive sentence. As stated above, the defendant was sentenced to life in prison without benefit of parole, probation, or suspension of sentence, as required by LSA-R.S. 15:529.1 for a fourth felony offender.
The legislature has sole authority under the Louisiana Constitution to define conduct as criminal and to provide penalties for such conduct. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Dorthey, 623 So.2d 1276 (La.1993). On numerous occasions, the Habitual Offender Law has been upheld as constitutional. Id. Since the Habitual Offender Law in its entirety is constitutional, the minimum sentences it imposes upon multiple offenders are also presumed to be constitutional. Id. While a court has the power to declare a sentence excessive even though it falls within the statutory limits provided by the Legislature, this power should be exercised only when the court is clearly and firmly convinced that the minimum sentence is excessive. State v. Johnson, supra. A sentencing judge must always start with the presumption that a *146 mandatory minimum sentence under the Habitual Offender Law is constitutional, and a court may depart from the minimum sentence only if it finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality. Id.
Failing to articulate reasons for the sentence as set forth in LSA-C.Cr.P. art. 894.1 when imposing a mandatory life sentence is not an error. Articulating reasons or factors would be an exercise in futility since the court has no discretion. State v. Williams, 445 So.2d 1264 (La.App. 3d Cir.1984), writ denied, 449 So.2d 1346 (La.1984). Considering the nature of the defendant's present convictions and his inability to refrain from criminal activity, the trial court did not err in imposing a life sentence. We find no evidence in this record which rebuts the presumption that the sentence is constitutional. This assignment lacks merit.

Error patent
The trial court informed the defendant that he had three years from the finality of his conviction to apply for post-conviction relief. The prescriptive period for post-conviction relief runs from the date the judgment of conviction and sentence becomes final. LSA-C.Cr.P. art. 930.8(A).
Because the trial court did not inform the defendant that the prescriptive period begins to run from the date the conviction and sentence become final, the trial court inadequately complied with LSA-C.Cr.P. art. 930.8. State v. Lofton, 26,732 (La. App.2d Cir.1/25/95), 649 So.2d 148. The trial court is hereby directed to give the defendant written notice that the prescriptive period for applying for post-conviction relief begins when the judgment of conviction and sentence becomes final, and file proof of the defendant's receipt of the notice in the record of this proceeding. State v. Ross, 26,272 (La.App.2d Cir.8/17/94), 641 So.2d 732.

CONCLUSION
The defendant's convictions for two counts of armed robbery and carjacking are affirmed. The defendant's conviction for first degree robbery is vacated and set aside. A conviction for simple robbery is hereby entered. The defendant's multiple offender adjudication and sentence are affirmed. The case is remanded for sentencing on the armed robbery, carjacking and simple robbery convictions.
ARMED ROBBERY CONVICTIONS, CARJACKING CONVICTION AND MULTIPLE OFFENDER ADJUDICATION AND SENTENCE AFFIRMED; FIRST DEGREE ROBBERY CONVICTION VACATED; CONVICTION FOR SIMPLE ROBBERY ENTERED, REMANDED FOR SENTENCING.