986 So.2d 772 (2008)
STATE of Louisiana
v.
Donald A. LOGAN Jr.
No. 07-KA-739.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*774 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of *775 Jefferson, Terry M. Boudreaux, Andrea F. Long, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On July 24, 2003, the Jefferson Parish Grand Jury returned an indictment charging defendant, Donald A. Logan, Jr., with first degree murder in violation of LSA-R.S. 14:30.[1] Defendant was arraigned on July 25, 2003 and pled not guilty. The trial court denied defendant's motion for change of venue on June 3, 2005. On June 20, 2006, the State amended the bill of information to charge defendant with second degree murder in violation of LSA-R.S. 14:30.1. On that same date, defendant was re-arraigned and pled not guilty.
On June 20-26, 2006, the case was tried before a 12-person jury which found defendant guilty as charged. The trial court denied defendant's motion for post verdict judgment of acquittal and motion for new trial on September 22, 2006. On that same date, defendant waived sentencing delays, and the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant's motion to reconsider sentence was denied on September 29, 2006. Defendant filed a timely motion for appeal that was granted.

FACTS
Karen Marrione testified that, on July 9, 2003, at approximately 2:30 p.m., her husband, Kelly, a recently retired New Orleans police officer, went to Lowe's to purchase a hand truck. At approximately 3:45 p.m., he returned home. Mrs. Marrione, who was in the back bedroom, heard what sounded like fireworks going off. As she started walking down the hall, she heard whizzing sounds. When she turned right to go into the den, she saw a white pickup truck in the driveway. Her husband subsequently came through the door, steadied himself against the wall, and said, "Get out the way, move, I've been shot." She thought that her husband was joking, but realized he was not when he collapsed, and she saw blood coming from his chest. At that time, she heard the screeching of tires and the truck quickly leaving her driveway. Mrs. Marrione called 911.
Dr. Brian Creely, Mr. Marrione's neighbor, testified that he went with Mr. Marrione in the ambulance to Charity Hospital; however, Mr. Marrione was pronounced dead in the emergency room. Dr. Susan Garcia, a qualified expert in the field of forensic pathology, testified that she performed Mr. Marrione's autopsy on July 10, 2003. She indicated that he had sustained three gunshot wounds: the first wound went through the left upper arm and came back out of his arm; the second wound went through the forearm and re-entered the chest penetrating the heart; and the third wound went into his left elbow. She testified that his blood alcohol level was .13.
Connie Fossier, Mr. Marrione's next door neighbor, testified that, on the afternoon *776 of July 9, 2003, Mr. Marrione pulled up in his driveway. They chatted for approximately five minutes, and then Mr. Marrione pulled his vehicle through his gate. She testified that he did not appear to be intoxicated. After she went inside her house, she heard what sounded like fireworks. She testified that there was a loud succession of fast, rapid fire first, then three softer sounding shots, one of which broke her window, then more fast, rapid shots, but not as many as the first time. When Ms. Fossier went to the side door, she saw a white truck backing out quickly. She noticed two white males between the ages of 25 and 30 inside the truck. She ran to the front window to get the license plate number; however, the license plate was "perfectly covered." The following day, Ms. Fossier was shown a photographic lineup, and she tentatively identified co-defendant, Mark Cambre, as the passenger.
Kristy Masangya, who lived across the street and two houses over from Mr. Marrione, testified that, on July 9, 2003, at approximately 3:45 p.m., she was walking out her front door to go to work when she heard loud noises that sounded like fireworks. Ms. Masangya subsequently saw a white truck peeling out of Mr. Marrione's driveway headed in her direction. As it passed, she saw two white males. She testified that she tried to get the license plate number but could not because it was "intentionally covered" with a white cloth or t-shirt. After Ms. Masangya was shown a photographic lineup the next day, she positively identified Mark Cambre as the passenger.
Loren Acosta testified that, on July 9, 2003, at approximately noon, he and Rene Gelpi went to eat lunch, and then went to the laundromat and the car wash. Acosta further testified that he received calls on his cell phone from Cambre during that time. While Acosta was at the car wash, he received a call from defendant who told him that Cambre had been shot.[2] Acosta asked defendant to bring Cambre to the hospital, but defendant said he could not. When Acosta asked defendant if he needed him to bring Cambre to the hospital, defendant replied affirmatively. After the conversation, Acosta dropped off his car at his house, picked up Gelpi's truck, and he and Gelpi went to Cambre's house.
When they got to Cambre's house, Acosta saw a white truck backed into the driveway. Acosta and Gelpi went inside and Acosta saw Cambre lying on the sofa bleeding from his stomach and his hand. While they were there, Acosta overheard defendant say something about getting into an altercation with someone. According to Acosta, defendant said, "We ran up on someone and got into a shoot-out," which meant to him in their circle of friends that defendant and Cambre were robbing someone.
Acosta and Gelpi subsequently took Cambre to Charity Hospital, and defendant stayed behind. During the drive to the hospital, they agreed to give a false name and tell the hospital that Cambre was robbed Uptown. When they got to Charity Hospital, Acosta saw numerous cameras and police cars, but he did not know why they were there. Acosta walked Cambre into the hospital, but the officers told Acosta to leave. While Acosta and Gelpi sat outside, police officers came out and asked them what was going on. Although Acosta did not initially tell the truth, he did so later.
Gelpi also testified at trial, and his testimony largely corroborated that of Acosta. Additionally, Gelpi testified that, when he *777 asked defendant if Cambre had hit anybody, defendant said, "I don't know. Johnny bad shot over here." When Gelpi asked defendant to whom he was referring, defendant responded, "both of them," which Gelpi assumed meant Cambre and Mr. Marrione.
Lieutenant Dwayne Scheuermann of the Jefferson Parish Sheriffs Office (JPSO) testified that he collected Mr. Marrione's personal effects at Charity Hospital, including a watch[3], his police identification, a gold chain, a Lowe's receipt dated July 9, 2003 at 3:20 p.m.,[4] and three pennies. No money clip or money was found on Mr. Marrione.[5] At some point later, Cambre was brought into Charity Hospital. Cambre gave him information regarding the source of his injuries; however, an investigation revealed Cambre's story was not credible.
JPSO Lieutenant Bruce Harrison testified that they conducted surveillance on defendant's home. When defendant arrived, the officers arrested him and read him his rights. Defendant denied involvement and acted surprised. JPSO Officer Donald Clogher testified that, after advising defendant of his rights, defendant said he had spent the entire day at his house. Defendant also denied any connection between him and a white truck.
JPSO Detective Donald Meunier testified that, on the evening of July 9, 2003, he brought Theresa Brennan[6] into the interview room to talk to defendant. Defendant told Brennan that he would not give any more information because Cambre's daughter was his goddaughter and that if Cambre and he went to jail, no one would be able to take care of her.
JPSO Lieutenant Dennis Thornton testified that a search warrant was executed on July 10, 2003 at 8001 Dalton Street[7], and no .380 semi-automatic weapons were found.
JPSO Lieutenant Grey Thurman testified that they searched defendant's room and found on the dresser a torn out section of a Times-Picayune classified ad showing jewelry items to buy, pawn, or sell, including Rolex watches. He further testified that cell phone records confirmed that cell phone calls were made on July 9, 2003 at 3:10 p.m. and 3:58 p.m. from Cambre to Acosta which supported statements made to that effect by Acosta. Lieutenant Thurman indicated that he obtained surveillance videotapes from Lowe's showing the entrance and exit of both defendant and Mr. Marrione, and shots of them in the store and at the register where they made their purchases on July 9, 2003. The videotapes showed that Mr. Marrione entered the store at 3:09 p.m. and left the store at 3:21 p.m. They also showed that defendant entered the store after Mr. Marrione and that he left the store at 3:15 p.m.
Lieutenant Thurman testified that, on March 8, 2005, Cambre's attorney dropped off two firearms in a box at the detective bureau. The ammunition that had been in those guns was located in a rear shed at Cambre's residence. It was determined *778 that this was the same type of ammunition that was found at the crime scene.
JPSO Captain Timothy Scanlan was qualified as an expert in the fields of firearms and tool mark examination, crime scene reconstruction, blood stain pattern analysis, and forensic science. Scanlan testified that the victim's .22 caliber mini-revolver was dropped on the scene by the victim when he was wounded. He further testified that the casings on the scene indicated that two .380 semi-automatic weapons were used by the perpetrators. He later determined that the weapons dropped off by the attorney were the two.380 weapons used in the shooting.
According to Scanlan, the driver of the truck shot seven times while circling around the truck, and the passenger of the truck, who was standing on the patio, shot four times. He could tell where the perpetrators were standing by the groupings of casings found on the scene. Scanlan explained that the gunshot residue found on the roof of the truck showed that defendant was firing a weapon over the truck at some point. He testified that the "stippling" on the arms of Cambre and the victim put them in close proximity to one another.[8] Two of the four projectiles from Cambre's weapon were recovered from the victim's body during the autopsy. Four projectiles from the victim's revolver were recovered from the scene, and the fifth one remained in Cambre's body. Although eleven total shots were fired by the perpetrators, only ten casings were found on the crime scene. However, the eleventh casing was found in the bed of the truck, which linked the truck to the crime scene.
Scanlan testified that .380 auto weapons will make louder sounds when fired and will shoot faster than a .22. He further testified that the description given by Connie Fossier of the shots she heard (loud, soft, loud) was consistent with the .380 auto weapons being fired first, then the quieter .22, and then the louder .380 auto weapons. It was Scanlan's opinion that the victim was receiving fire from two shooters and shooting back as he slammed the door to his home shut while remaining outside of the door. It was also his opinion that both shooters were out of the truck firing simultaneously, because it was determined that there were shots from the driver with the door to the victim's home open, shots from the passenger with the door partially closed, and then shots from the driver with the door closed all the way. Scanlan explained that very rarely in forensic science did they have evidence, like they did in this case, to tell them exactly when shots were fired.
Greg Harrell, a stipulated expert in the fields of molecular biology and forensic DNA analysis, testified that he received buccal swabs from Cambre, defendant, and Mr. Marrione and red blood-like samples from the crime scene. He further testified that four of the samples from the crime scene were consistent with blood stain from the victim, and that one of the samples from the crime scene was consistent with the buccal swab from Cambre. Harrell indicated that several swabbings of blood-like substances were also collected from the 1998 Toyota truck. He explained that there were no results for one sample, but the others were consistent with the reference sample from Cambre. According to Harrell, samples were taken from Cambre's residence, and all were consistent with Cambre's reference sample except for the kitchen faucet.
*779 Michael Goodwin of the JPSO crime scene division testified that he retrieved evidence at the hospital and took photographs of the victim. He further testified that he performed gunshot residue tests on the hands of the victim and Cambre. He explained that the results were negative on the victim's hands, positive on Cambre's right hand, and negative on Cambre's left hand. Alfred Schwoeble, a stipulated expert in the field of gunshot residue, testified that the gunshot residue test on Cambre's right hand was inconclusive, and the gunshot residue test on the passenger-side roof of the truck was positive.
After the State rested its case, the defense called Patricia Logan, defendant's mother, as a witness. Logan testified that defendant's father, who was deceased, had been a gun collector, that she and her husband had permits for guns, and that it was not unusual for defendant to have a gun with him. She further testified that defendant's father was in the jewelry business, and that defendant worked there after school while growing up. She stated that it would not be difficult to determine if a Rolex watch was stolen because their serial numbers are recorded.
Kristin O'Brien testified that she and Cambre had a 9-year-old daughter. She further testified that her father was Paul Bonin, a retired New Orleans police officer, and that her father and Mr. Marrione were good friends.
Defendant testified that, on July 9, 2003, at lunch time, his girlfriend picked him up at his house in her father's white Toyota truck, and they went to eat lunch. Afterwards, defendant took her back to work and borrowed the truck. Defendant then picked up Cambre at his house on Dalton Street. They subsequently went back to defendant's house so they could do some exterior home improvement work; however, they could not do so because it was raining. After awhile, defendant and Cambre decided to go to Lowe's so defendant could buy a hacksaw to do some home improvement work on Cambre's house.
When defendant arrived at Lowe's he parked the truck, but Cambre remained inside so he could guard the tools and ladder on the back of the truck. Defendant subsequently went into Lowe's, stayed four or five minutes to get the hacksaw, came back out, and walked directly to the truck. He denied seeing Mr. Marrione while he was inside Lowe's, and he denied knowing who Mr. Marrione was at that point. Defendant then decided to tie down the ladder to the tailgate or bumper of the truck with a drop cloth because he realized upon arriving at Lowe's that the ladder in the back was sliding around. After tying down the ladder, defendant got back into the truck. At that point, Cambre spotted Mr. Marrione leaving the parking lot in his vehicle.
Defendant and Cambre had a conversation, after which defendant began following Mr. Marrione, because Cambre wanted to speak to Mr. Marrione who was helping Cambre get his suspended driver's license back. Defendant eventually turned onto Toby Lane and pulled into Mr. Marrione's driveway all the way to the back of the house behind Mr. Marrione's SUV. Cambre exited the truck and closed the door, and defendant remained inside with the radio on, the windows up, and the truck running. Defendant observed that the back door was open to Mr. Marrione's house, and that Mr. Marrione came to the back door and stood in the doorway. He could not hear the conversation between Mr. Marrione and Cambre.
Defendant noticed that Mr. Marrione was becoming agitated. When defendant glanced down to turn the radio down, he heard gunshots. He looked over to the *780 passenger side and saw Mr. Marrione shooting Cambre, who did not have a gun in his hand. According to defendant, Cambre fell to the ground, after which Mr. Marrione pointed his gun at defendant and fired a shot at the passenger window. The window shattered, and defendant was scared. He grabbed his gun and stepped outside of the truck. Mr. Marrione looked at him and fired, and defendant began firing "blindly." At some point, Mr. Marrione retreated inside the house and slammed the door shut.
Afterward, the shooting stopped, and defendant and Cambre got back into the truck. Defendant backed out of the driveway and drove to Cambre's house. On the way there, Cambre was screaming and hollering that he was in pain. When they got to Cambre's house, defendant helped Cambre inside. Cambre called Acosta, who came over with Gelpi. Cambre left with them, and defendant stayed behind and cleaned up. Defendant subsequently went to his brother's house. When he returned to his house, the police arrested him. Defendant told his girlfriend at the police station that he was not making a statement against Cambre because Cambre's daughter was his godchild. He testified that he was not planning to commit an armed robbery.

DISCUSSION
By this appeal, defendant first argues that the trial court erred by denying his motion for change of venue. He contends that a jury composed of fair and impartial jurors could not be secured in Jefferson Parish because of the extensive media coverage of the case. He further contends that information regarding the murder of a former New Orleans police officer in front of his Metairie home in the middle of the day saturated the community and inflamed its passions against defendant. He notes that almost everyone knew that his co-defendant, Mark Cambre, had already been convicted of first degree murder. He asserts that he was forced to accept jurors who admitted having extensive knowledge about the case, since his challenges for cause were denied, and his limited peremptory challenges were ultimately exhausted.
On April 8, 2005, defendant filed a motion for change of venue, arguing that he could not obtain a fair trial due to the publicity surrounding the prior trial and conviction of his co-defendant, Mark Cambre. The State filed an answer to defendant's motion, responding that defendant had not yet established a collective community prejudice that would warrant a change of venue. The State further responded that, absent a finding of such prejudice that would make a fair trial for defendant impossible, the trial court should deny the motion.
On June 3, 2005, defense counsel argued at the hearing that the motion for change of venue should be granted due to the effect the pretrial publicity had on defendant's right to obtain a fair and impartial jury. He noted that he had brought 25 newspaper articles from July of 2003 until March 14, 2005 for the court to review (which the trial judge admitted into evidence). He stated that this case was front-page news, and that the Times-Picayune had selected the story of the killing of Mr. Marrione as one of the top ten news stories of 2003.
Defense counsel asserted that Marrione was well-known, made numerous television appearances, and was very active in the Night Out Against Crime program. He contended that some of the news that was widely disseminated was incorrect, especially the television news reports. He said that there were interviews with the Marrione family and statements by the prosecutor in the media that a jury would not *781 normally hear until the penalty phase. Defense counsel also pointed out that the testimony of the State's expert, Timothy Scanlan, was reported in detail in the newspaper. He argued that defendant should have the same level playing field that his co-defendant, Mark Cambre, had, and he asked that defendant be given an opportunity to have an impartial jury.
The prosecutor responded that defendant had failed to show actual prejudice in the community's mind. He argued that the motion was premature. He stated that defense counsel could be given the opportunity to re-urge his motion at a later date if the trial court found during the jury selection process that there was a collective community bias against defendant. He contended that pretrial publicity alone was not enough to warrant a change of venue.
The trial judge said that this incident occurred more than two years ago, and that people forget things of that nature. She said that defense counsel had not shown any actual proof as to why the motion should be granted. She denied the motion, but allowed defense counsel to reurge it later after they started jury selection. Defense counsel noted his objection.
On June 21, 2006, after jury selection but prior to the taking of trial testimony, defense counsel re-urged his motion for a change of venue. He argued that the jurors who knew about the Cambre case would tell the others about Cambre's conviction. The prosecutor responded that there were no grounds for a change of venue. He stated that all of the jurors who were left said that they could be fair, and he noted that the court had excused a number of them who said that would be difficult because of the news reports they had read. He indicated that only one juror knew about Cambre's conviction and that juror had been excused.
The trial judge said that everyone who was left on the jury indicated that they would be fair and impartial even though they had some knowledge of the case through the media. She stated that they brought each potential juror up to the bench to discuss what they had heard or seen about the case so that the remaining jurors would not be tainted. She recalled, as the prosecutor did, that only one potential juror knew about Cambre's trial. She noted that it would have taken a very long time to choose a jury who had no knowledge of the case whatsoever, considering that it was a well-known case discussed on the news and in the newspaper. Based on those reasons, the trial judge denied the request for change of venue. Defense counsel noted his objection.
"A defendant is constitutionally guaranteed an impartial jury and a fair trial." La. Const, art. 1, § 16. "To accomplish this end, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue." State v. Manning, 03-1982, p. 6 (La.10/19/04), 885 So.2d 1044, 1061, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
LSA-C.Cr.P. art. 622 provides the grounds for a change of venue:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir *782 dire examination or the testimony of witnesses at the trial.
Absent unusual circumstances, the defendant bears the burden of showing actual prejudice. State v. Manning, 03-1982 at p. 7, 885 So.2d at 1061. "Whether the defendant has made the requisite showing [of actual prejudice] is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion." State v. Frank, 99-0553, p. 14 (La.1/17/01), 803 So.2d 1, 14.
"The defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial." State v. Frank, 99-0553 at p. 14, 803 So.2d at 15. "Thus, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime." State v. Clark, 02-1463, p. 18 (La.6/27/03), 851 So.2d 1055, 1071, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). "Courts must distinguish, however, largely factual publicity from that which is invidious or inflammatory, as they present real differences in the potential for prejudice." Id.
Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307, 311 (La.1975); see also Manning, 03-1982 at pp. 7-8, 885 So.2d at 1061-62. Moreover, "courts have examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind." Clark, 02-1463 at p. 18, 851 So.2d at 1071.
After reviewing the record, we find that the trial judge did not abuse her discretion by denying defendant's motion for change of venue.
Regarding the nature of the pretrial publicity and the connection of government officials with its release, defendant filed into evidence 25 Times-Picayune newspaper articles, two letters to the editor from the victim's family, and the victim's obituary, dated July 10, 2003 through March 28, 2005, in support of his motion for change of venue. The first three articles dated July 10-25, 2003 discussed the incident when it first occurred. The information in those articles was primarily obtained from the Jefferson Parish Sheriffs Office spokesman, the sheriff, and the first assistant district attorney. The next three articles recalled the victim's work as a crime prevention officer in the community (August 5-14, 2003). From August 13-19, 2004, the articles detailed co-defendant, Mark Cambre's first trial that ended in a mistrial. From March 4-14, 2005, the articles detailed Cambre's second trial, which resulted in a first degree murder conviction and life sentence. Although the articles regarding the Cambre trial provided a summary of the trial testimony, they were balanced in that they set forth both sides *783 of the case. Also, those articles mostly discussed Cambre's role in the incident. None appeared to be inflammatory.
The record reveals that 43 of the 58 potential jurors (74%) were at least vaguely familiar with this case through media accounts or informal private conversations. However, the record also reveals that the trial court excused the eight jurors for cause (14%) who said they could not be impartial because of pretrial publicity or because they were acquainted with the victim's family. Those statistics are consistent with other similarly situated cases in which venue was not changed.[9] It is noted that only one juror remembered from news reports "the first guy" who was tried and convicted. Nevertheless, defense counsel accepted her as the first alternate in light of her other responses, and she ultimately became a juror when one of the other jurors was dismissed.
As to the length of time between the publicity and the trial, defendant's trial in June of 2006 was approximately three years after the incident and approximately 15 months after the second Cambre trial. As such, defendant was not the subject of media coverage for a prolonged period of time prior to his trial. With respect to the severity and notoriety of the offense, the killing of a retired police officer at his home during the middle of the day during an armed robbery was disturbing to the community.
Regarding other events occurring in the community that affected or reflected the attitude of the community or individual jurors toward defendant, the three newspaper articles mentioned previously and testimony at trial show that the victim was beloved by fellow officers and members of the community for his long-time work in crime prevention programs, particularly the National Night Out Against Crime. As to any factors likely to affect the candor and veracity of the prospective jurors on voir dire, the record shows that the potential jurors were questioned individually so as not to taint the remaining jurors. As such, those jurors were able to give what appeared to be truthful, thoughtful, and candid answers regarding their views and opinions of this case.
In conclusion, the record reflects that the majority of prospective jurors had some knowledge of this case due to pretrial publicity. Those jurors were questioned individually and extensively regarding that knowledge and their ability to be fair and impartial. The jurors who knew the victim's family or said they had preconceived opinions of defendant's guilt or innocence and could not be fair and impartial were excused from the jury. As such, defendant has failed to show in the context of the Bell factors that actual prejudice existed rendering a change in venue necessary. Defendant also failed to show a community bias toward him.
In light of the foregoing, we find that the trial court did not abuse its discretion by denying defendant's motion for change of venue.
Defendant next argues that the trial court erred by denying his motion for mistrial. He contends that Lieutenant *784 Scheuermann violated the rule of sequestration by making intimidating remarks in the hallway during trial. He notes that the jury also heard Lieutenant Thurman, the case officer, talking about the case in the courtroom. He argues that those incidents gave a clear signal to the jury that conviction of murder was the only option when a police officer was killed. In light of those incidents, defendant maintains that he could not receive a fair trial.
The record reflects that, on June 22, 2006, the second day of trial, defense counsel informed the trial judge that an incident happened the day before as he was leaving court that he wanted to bring to the trial judge's attention. He stated that, when he went outside the courtroom, he found his client's mother, Patricia Logan, crying in the hallway. Defense counsel was informed that one of the State's witnesses, Lieutenant Scheuermann, who testified the day before, had been out in the hallway talking to other witnesses, namely, Kristy Masangya and another witness in the hallway, and telling them in a loud voice that defendant never would have lived to get to court if it had been up to him.
Defense counsel argued that this incident violated the sequestration order and created a climate of intimidation which had persisted throughout the case. He also noted that Grey Thurman, the designated case officer, was speaking in a loud voice in the back of the courtroom within earshot of jurors about the case. Defense counsel argued that these incidents made it difficult for his client to get a fair trial, and he moved for a mistrial.
The prosecutor responded that Lieutenant Thurman had been professional throughout the proceedings, and if his voice was raised, it was unintentional. He also stated that he had told Lieutenant Thurman that defense counsel had a concern about that. With respect to Lieutenant Scheuermann, he was not sure what happened in the hallway. He noted, however, that Lieutenant Scheuermann was never in contact with defendant and never testified to ever having been in contact with defendant and, therefore, the sequestration order was not violated.
The prosecutor further responded that, if defense counsel's allegations were correct, the "most you have" is a New Orleans police officer venting his frustration after he testified. He indicated that he would instruct his witnesses to make sure no comments were made in front of any other witnesses. He stressed that the venting of a police officer was not a violation of a sequestration order. Defense counsel asked to call Mrs. Logan to "make the record" because he found her credible and the allegation serious. The prosecutor said that there was no relevant basis for it.
The trial judge stated that, even if what defense counsel alleged was true, she was not going to grant the motion for mistrial. She said that she was sorry that it happened and remarked that Mrs. Logan was a family member. She also said that she was going to instruct the State "very strongly" not to allow it to occur again. The trial judge explained that she knew emotions were "running high" on both sides, and that if she had to clear the halls and the courthouse she would. She told counsel that they needed to instruct their witnesses that there was to be "none of this." The trial judge also said that if it happened again on either side, she would clear the courtroom and take one witness at a time. She then denied the motion for mistrial. Defense counsel noted his objection.
Under LSA-C.Cr.P. art. 775, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside *785 the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." LSA-C.Cr.P. art. 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
LSA-C.Cr.P. art. 771 provides the law regarding admonitions:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
"A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial." State v. Smith, 04-340, p. 5 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 285. "Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion." Id.
In the instant case, defense counsel did not state, nor did the record indicate, the substance of the remarks Lieutenant Thurman is alleged to have made in the courtroom in front of the jury. Therefore, it is impossible to determine whether they were within the scope of LSA-C.Cr.P. art. 770. Nevertheless, defense counsel did not move for a mistrial or an admonishment after those remarks were made. It is clear, however, that the remarks allegedly made by Lieutenant Scheuermann were made in the hallway and not in front of the jury. Therefore, those remarks were not within the scope of LSA-C.Cr.P. art. 770, and a mistrial was not mandatory.
After reviewing the record, we find that the remark made by Lieutenant Scheuermann in the hallway did not make it impossible for the defendant to obtain a fair trial. First of all, the incident was brief, *786 considering that the trial lasted six days. Secondly, after acknowledging that both sides were very emotional, the trial judge strongly and repeatedly indicated to counsel that they were to instruct their witnesses not to make remarks about the case in front of the other witnesses. She stressed that if it happened again, she would clear the courtroom and the hallways, take one witness at a time, and make everyone else wait outside.
In light of the foregoing, we find that the trial court did not err by denying the motion for mistrial.
Defendant next argues that the trial court erred by failing to grant a new trial when a juror saw him in shackles.
On August 11, 2006, defendant filed a "motion for new trial and motion for post verdict judgment of acquittal." In that motion, defendant argued, inter alia, that his right to due process was violated when a juror viewed him wearing shackles during trial.
On September 22, 2006, at the hearing on the motion, the defense called Deputy Barbara Barilleaux as a witness. Deputy Barilleaux testified that she and another deputy were assigned to transport defendant to and from jail during his trial. She further testified that defendant was shackled and handcuffed while he was being transported, which was their procedure. After court had concluded one day during trial, she and the other deputy were informed that everyone had been cleared from the courtroom.
They subsequently took defendant down to the first floor in the elevator, and the three of them got off. Defendant was placed against the wall by the elevator door inside the glass building facing Derbigny Street until transport arrived. Deputy Barilleaux testified that, when she walked toward the two entrance doors, she saw a young man on a cell phone with his back to them. One of the Gretna deputies called to her attention that the young man was a juror. They asked the Gretna deputy to have the juror go around the glass building and stand in that area. After the juror left, they put defendant into the van and transported him back to the Jefferson Parish Correctional Center.
Deputy Barilleaux testified that there was no contact at all between the juror and defendant, and that it was not possible that the juror could have viewed defendant from where defendant was standing. She indicated that the juror did not come up to the glass doors of the courthouse and try to enter, nor did he come through those glass doors when defendant was in there shackled or handcuffed. She also testified that defendant was not shackled or handcuffed in front of the jury during trial, only while being transported to and from the jail.
Defendant testified at the hearing that, on Saturday, June 24, 2006, he was leaving court for the day with two deputies. When he walked out of the elevator, he saw Mr. Garrison, one of the jurors, outside the two double glass doors talking on his cell phone. He further testified that he made eye contact with Mr. Garrison, who was approximately six feet away from him at the time. He noted that the glass doors were approximately four feet from the elevators, and that the juror was standing just outside those doors. The deputies told Mr. Garrison to leave, and they waited a minute or so.
Afterwards, defendant walked outside. He indicated that, as he was getting in the back of the transport vehicle, Mr. Garrison was still outside, approximately 15 feet away from him, talking to several police officers right outside the building. Deputy Arnona told defendant that was grounds for a mistrial; however, defendant did not *787 take his word for it. Later on, defendant researched the issue and learned that Deputy Arnona was correct. Defendant testified that he did not report this incident to anybody during his trial because he did not realize "it was a factor."
After defendant testified, defense counsel told the trial judge that he had tried to subpoena the juror, Travis Garrison, an L.S.U. student; however, he was unable to serve Mr. Garrison at his home address in Metairie. He argued that it was prejudicial error for a juror to see defendant in shackles, and that the case law was clear that that error affected the presumption of innocence to which defendant was entitled. Defense counsel asked the trial judge to continue the hearing for two more weeks so he could serve a subpoena on Mr. Garrison in Baton Rouge.
The prosecutor objected to the juror being subpoenaed. He contended that defendant did not disagree that the juror was outside the glass doors, and he asked for judicial notice that the glass doors were much more than four feet from the elevators. He pointed out that the case law defense counsel referred to involved a defendant who was shackled during the entire penalty phase, and that was the reason the case was reversed. He also distinguished other cases from the instant one, arguing that, in those cases, defendant was shackled and handcuffed during the trial.
The trial judge commented that defense counsel had ample time since June to subpoena any witnesses that he needed. She then denied the motion for continuance and motion for new trial, giving the following reasons:
Everybody in this system knows how important it is for these folks not to be seen. It becomes very difficult sometimes to carry through on that procedure just simply because of the largeness of the area and the fact that we've got to transport them outside, the fact that we're in this building and we have to transport them outside to get them to and from. I think everybody did everything that they possibly could have done. He was noticed. He was asked to step away.
If he is in this building at the back elevators, there is no reason for him to be back there. He can't get in those doors. He had to be further away than anybody  than your client indicated that he was, because there is just absolutely no reason for him to get in there. That's where the van comes to pick them up.
So for all of those reasons I am going to deny it. And I feel compelled to make this comment, too. For us to think that a jury is so naive as to not think a person charged with second degree murder is not in jail, I just think we're  I just think they have to know that he is in jail. Whether they see him in shackles or not, they just pretty much have to know that in a case of this magnitude, that he's already in jail. Very few folks are out and people who serve in juries are just not that naive to believe that folks are out of jail when they are charged with second degree murder.
Okay, for all of those reasons I am denying the motion for a new trial, post-judgment acquittal, whatever else was set today.
Defendant filed a motion for a new trial under LSA-C.Cr.P. art. 851(4) which provides that a court shall grant a new trial if "the defendant has discovered, since the verdict or judgment of guilt, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment."
*788 LSA-C.Cr.P. art. 855 sets forth the necessary allegations when a motion for new trial is based on prejudicial error or defect in the proceedings:
A motion for a new trial based on ground (4) of Article 851 shall contain allegations of fact sworn to by the defendant or his counsel, showing:
(1) The specific nature of the error or defect complained of; and
(2) That, notwithstanding the exercise of reasonable diligence by the defense, the error or defect was not discovered before or during the trial.
"Under LSA-C.Cr.P. art. 851(4), the error or defect must be prejudicial to the defendant before a new trial can be granted." State v. Tracy, 02-227, p. 19 (La. App. 5 Cir. 10/29/02), 831 So.2d 503, 515, writ denied, 02-2900 (La.4/4/03), 840 So.2d 1213. "The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only where there is a clear showing of abuse of that discretion." Id., 02-227 at p. 14, 831 So.2d at 512.
"Ordinarily, a defendant should not be shackled, handcuffed or garbed in any manner destructive of the presumption of his innocence and of the dignity and impartiality of judicial proceedings." State v. Wilkerson, 403 So.2d 652, 659 (La.1981). "However, exceptional circumstances may require, within the discretion of the trial court, the restraint of the prisoner for reasons of courtroom security or order or where the prisoner's past conduct reasonably justifies apprehension that he may attempt to escape." Id.
In Wilkerson, supra, trial was adjourned for the day. Before the jury was able to file out of the courtroom, a member of the sheriffs office handcuffed the defendant and his co-defendant. More than half of the jury passed within three or four feet of the defendant and, defendant argued, saw that he was handcuffed. On this basis, defense counsel moved for a mistrial. The Louisiana Supreme Court affirmed the denial of the motion for mistrial. It stated that defendant's apparent disregard for the authority and lives of police officers would suggest some security measures were in order. It noted that defendant and his co-defendant were not handcuffed during trial, but solely for purposes of transport to and from the courtroom. It found that, under the circumstances, the possibility that on one occasion several jurors may have seen defendant in handcuffs did not appear to have so prejudiced defendant as to warrant relief on appeal. Id.
In State v. Johnson, 94-1172, pp. 1-6 (La.App. 4 Cir. 12/15/94), 648 So.2d 43, 44-46, a juror may have seen defendant in handcuffs and shackles during a recess in the trial. The juror was questioned in chambers. The next day, defendant moved for a mistrial which was denied. The appellate court, citing Wilkerson, could not say that the trial court abused its discretion in denying the motion. The appellate court noted that only one of the jurors saw defendant inadvertently in shackles and handcuffs, and there was no evidence that defendant was seen in prison garb. The appellate court also noted that the fact that defendant was casually observed in restraints pursuant to routine transportation procedures, but was released from such restraints in the courtroom, may have been to defendant's benefit, as those actions could have created the impression that defendant was non-violent and of no threat to anyone in the courtroom and, therefore, was less likely to have committed the violent act of which he was accused. Id.
In the instant case, we fail to find that the trial court abused its discretion by *789 denying the motion for new trial on the basis of one juror inadvertently observing defendant in shackles and handcuffs. Defendant was not shackled or handcuffed during trial. He was only shackled and handcuffed for purposes of transport to and from the courtroom. Additionally, the testimony at the hearing indicates that the juror may not have seen defendant in restraints, since the deputy testified that the juror's back was to them when defendant exited from the elevator. However, even assuming the juror did see defendant in restraints, that brief incident does not appear to have so prejudiced defendant as to warrant relief on appeal. Also, as the Johnson court found, the incident may have benefited defendant.
In light of the foregoing, we fail to find that the trial court erred in denying defendant's motion for new trial.
Finally, defendant argues that the trial court erred by admitting gruesome photographs of the victim into evidence and publishing them to the jury. He contends that the photographs were introduced only to inflame the jury's emotions and create prejudice against him. He further contends that the photographs were not probative, as they did not prove any element of the crime, and that identity and cause of death were not at issue. He asserts that the only issue was self-defense. He notes that the photographs did not accurately reflect the injuries since they were taken after medical procedures had been attempted on the body. He also argues that the photographs were cumulative and highly prejudicial to his ability to get a fair and impartial jury trial.
On January 9, 2004, defendant filed a motion in limine to exclude autopsy photographs. In his motion, defendant argued that the probative value of those photographs was limited, because the body had been moved, altered by medical procedures, and rolled in blood before the photographs were taken.
On March 26, 2004, at the hearing on the motion, defendant made the same arguments that he made in his written motion. The prosecutor responded that the motion was premature. He contended, however, that it was his intention to introduce the photographs to assist his experts with their testimony, especially concerning the issues of whether one or both perpetrators fired a weapon, the position of the victim, the track of the wounds, and the "stippling" to the bodies of the victim and the co-defendant.
The prosecutor also stated that he would not publish the photographs to the jury without first giving the court the opportunity to rule on relevance and to conduct a balancing test. Defense counsel said that, at some point before trial, the court should review the photographs in chambers. After hearing arguments of counsel, the trial judge said that a ruling on the photographs was premature at that time. She did indicate that before any photographs were introduced into evidence, she would look at them before they were admitted or published to the jury.
The record reflects that, immediately prior to the trial testimony of Michael Goodwin, the JPSO crime scene technician who took photographs of the victim at the hospital, defense counsel lodged an objection to introducing any gruesome autopsy photographs at that point or showing them to the jury. He argued that Dr. Susan Garcia had not testified yet, and there was nothing relevant or probative in the photographs. He stated that he did not mind the prosecutor showing the photographs to the witness, but that it would be unduly prejudicial to show them to the jury. He argued that the witness would not know the significance of the photographs, and *790 that some of them looked "pretty gruesome."
The prosecutor responded that he would not publish them to the jury; however, he noted that they were the same photographs introduced at the last trial of Mark Cambre that were published to the jury. Defense counsel said that they were trying the case in a small space and, therefore, the photographs would be visible to the jury. He asked that they not be shown to the jury until Dr. Susan Garcia could establish probative value. The prosecutor stated that he would only ask Goodwin to identify them. The trial judge said that he should make sure that Goodwin did not turn them over so the jury would not see them.
On direct examination, Goodwin identified the state's exhibits as the photographs he took of the victim in the emergency room. He testified that those photographs accurately depicted the injuries he observed on the victim that afternoon. He did not describe each photograph in detail. The record indicates that those photographs were not admitted into evidence during Goodwin's testimony. The record also indicates that they were admitted into evidence without objection and published to the jury at the end of the State's case, just before the State rested.
After Goodwin's testimony was concluded and the jury left the courtroom, defense counsel asked the trial judge if they could review the photographs, arguing that they were unnecessarily gory and not probative of anything, unless the prosecutor wanted to explain the importance of showing the victim's face. He stated that he did not have a problem with the close-ups, but that some of the photographs showed medical procedures that were done.
The prosecutor again noted that the photographs were the same ones introduced at the last trial, and that there was an exhibit in globo from the last trial of all the photographs that they did not use. Defense counsel indicated to the trial judge that he was watching the jury's faces when the prosecutor was handling the photographs and noted their reaction to the photograph of the victim's face. He also argued that the body was rolled in blood while in the ambulance.
The prosecutor responded that Dr. Garcia looked at the photographs with him and excluded the ones showing too much blood. The prosecutor said he did not want to use those. After hearing arguments of counsel, the trial judge allowed the prosecutor to use the photograph of the face, stating that the jury had to identify the victim. She said, "The rest of them are close-ups of the wound in the heart, which they removed. These are not bad at all." Defense counsel noted his objection.
The prosecutor then called Dr. Susan Garcia as a witness who testified that she performed the autopsy on the victim. She further testified that the victim sustained three gunshot wounds, one of them lethal. Dr. Garcia identified State's Exhibits 50 through 57 as photographs of the victim and wounds he sustained at the time the autopsy was performed. Afterwards, the prosecutor introduced the photographs into evidence and asked that they be published to the jury. Defense counsel had no objection, and the trial judge stated that those exhibits would be admitted and published to the jury.
Dr. Garcia testified that State's Exhibit 50 depicted the victim's face prior to the beginning of the autopsy and prior to them removing the medical devices found on the body. She noted that the victim's right eye was bruised and swollen and indicated that it was the result of a recent injury of blunt force nature. She testified that State's Exhibit 51 depicted the victim's left *791 arm with one of the wounds he sustained; State's Exhibit 52 depicted the wound to the chest showing an oval shape indicating a re-entrance wound; State's Exhibit 53 was a photograph of the entrance wound into the victim's heart; State's Exhibit 54 showed an exit wound on the back of the arm; State's Exhibit 55 depicted entrance wound number three near the elbow and the location from which she recovered a projectile; State's Exhibit 56 showed one of the entrance wounds going into the elbow; and State's Exhibit 57 depicted the extensive nature of the exit wound "partially from number 3, because it fractured some bone in number 2, which also caused it to re-enter into the chest cavity."
Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. LSA-C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. LSA-C.E. art. 403.
Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any prejudicial effect. State v. Battaglia, 03-692, p. 10 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 710, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058 (citation omitted). "The state is entitled to the moral force of its evidence and post mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement, and number of wounds, as well as to provide positive identification of the victim." State v. Condley, 04-1349, p. 18 (La.App. 5 Cir. 5/31/05), 904 So.2d 881, 892-93, writ denied, 05-1760 (La.2/10/06), 924 So.2d 163 (citations omitted).
"Generally, an appellate court places great weight upon a trial court's ruling on the relevancy of evidence and such a determination will not be reversed absent a clear abuse of discretion." State v. Battaglia, 03-692 at p. 10, 861 So.2d at 711 (citation omitted).
"Photographic evidence is properly admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict the defendant without sufficient other evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value." State v. Jones, 99-798, p. 7 (La.App. 5 Cir. 11/10/99), 748 So.2d 1176, 1179, writ denied, 00-0306 (La.12/8/00), 775 So.2d 1076 (citation omitted).
In the instant case, the autopsy photographs were relevant to show the manner of death and the location, placement, and number of the bullet wounds on the victim's body. Although the photographs identified by Goodwin showed many of the same wounds as the photographs identified by Dr. Garcia, the photographs identified by Dr. Garcia were mostly close-ups of those wounds which she used to illustrate each bullet's trajectory as an entrance or exit wound. As such, we find that the photographs were not repetitive or cumulative.
Additionally, Dr. Garcia was able to show through the photographs that the victim was in a defensive-type posture when one of the wounds was inflicted, which was important since defendant claimed self-defense. And while these *792 photographs were certainly unpleasant, they were not excessively gruesome. Accordingly, defendant failed to show that the photographs were clearly more prejudicial than probative and that this Court should interfere in the trial court's exercise of its broad discretion to admit the evidence.
In light of the foregoing, we fail to find that the trial court erred by admitting the photographs into evidence and publishing them to the jury.

ERROR PATENT DISCUSSION
Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. The review reveals no errors patent in this case.

DECREE
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant Donald A. Logan, Jr. are affirmed.
AFFIRMED.
NOTES
[1] Mark T. Cambre was also indicted as a co-defendant. On June 23, 2004, the State filed a notice to sever the defendants and proceed to trial against each one separately. It is noted that Cambre was tried and convicted, and his conviction and sentence were affirmed on appeal. State v. Cambre, 05-888 (La.App. 5 Cir. 7/25/06), 939 So.2d 446, writ denied, 06-2121 (La.4/20/07), 954 So.2d 158.
[2] Acosta identified his car wash receipt dated July 9, 2003 at 3:56 p.m.
[3] Lieutenant Grey Thurman later testified that the watch retrieved from the victim was a Rolex watch.
[4] Lieutenant Grey Thurman later testified that the receipt indicated a purchase of a hand truck at Lowe's in Metairie on Veterans Boulevard.
[5] Mrs. Marrione previously testified that her husband carried his money in a money clip and not a wallet.
[6] Lieutenant Grey Thurman later testified that Brennan was defendant's girlfriend.
[7] Lieutenant Thurman later testified that 8001 Dalton Street in Metairie was Mark Cambre's residence.
[8] Scanlan explained that "stippling" was abrasions on the skin caused by gunpowder as it embeds in the skin. Dr. Garcia testified previously that the "stippling" on the victim's forearm was consistent with someone raising his arm in a defensive-type posture.
[9] See State v. Frank, 99-0553, pp. 16-17 (La.1/17/01), 803 So.2d 1, 16-17 (110 out of 113 venire members (97%) had been exposed to some publicity surrounding the case, and 89% of the prospective jurors indicated they had been exposed to information about the case on more than one occasion or from multiple sources); State v. Hoffman, 98-3118, p. 9 (La.4/11/00), 768 So.2d 542, 555 (72 out of 90 prospective jurors (80%) had awareness of the case before trial); State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 120 out of 139 potential jurors (86.33%) possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts).