WALTER J. ROTHSCHILD, Judge.
 

 |¡>,Defendant, Lloyd W. Addison, was charged by bill of information with attempted second degree murder in violation of LSA-R.S. 14:30.1 and 14:27, was arraigned and pled not guilty. The trial court denied defendant’s motion to suppress evidence and statement. On September 11, 12, and 13, 2007, the case was tried before a 12-person jury which found defendant guilty of the responsive verdict of attempted manslaughter. On November 9, 2007, the trial court denied defendant’s motion for new trial. On that same date, defendant waived sentencing delays, and the trial court sentenced him to imprisonment at hard labor for 20 years. This timely appeal follows.
 
 [1]
 

 lijThe State presented the following testimony and evidence at trial:
 

 On April 15, 2006, at approximately 8:00 p.m., Charlotte Rush and defendant, her boyfriend, checked into the Deep South Motel on Airline Highway in Metairie to spend time together away from their families and to use drugs. During the night, they sat on the bed and smoked crack cocaine, talked, and watched television. At one point, defendant jumped up and said, “You’re doing someone under the
 
 *711
 
 mattress.” When Rush asked defendant what he was talking about, he explained that there was a trap door under the mattress.
 

 Rush got up and lifted the mattress, inadvertently hitting the wall, and defendant accused her of “giving him signals.” Rush told defendant he was “freaking out” and that he needed to calm down. Defendant said, “Don’t tell me to calm down ... what’s his name?” Rush could not think of a name so she made up a name, “Larry,” which was the name of her son. Defendant opened the door and stepped outside of the motel room, but Rush asked him to come back inside so they could talk about the situation. When defendant came back inside, he hit Rush in the nose with what she thought was a bat that he had put in the corner of the room.
 

 After defendant struck Rush in the face, he grabbed her by the hair, threw her in the bathroom, and started punching her. Defendant then left and closed the bathroom door. Rush subsequently heard defendant outside the door, so she opened it and said, “Let’s talk.” At that time, she noticed that defendant had knives in his hand. Rush called defendant’s name, but he went toward the door to the hotel room. She did not want him to hurt anyone, so she told him to come back. Defendant turned around, grabbed her, and started stabbing her. He threw Rush back into the bathroom and closed the door, and Rush tried to hide underneath the sink.
 

 UDefendant came into the bathroom and started stabbing her again and beating her. He dragged her out of the bathroom and told her to take off her shirt, saying “I know you’re wired.” She took her shirt off and told him again he was “freaking out.” Defendant stabbed Rush in the head, neck, chest, hands, and leg. He put a knife to her throat and said, “Tell him the gig’s up, come in, come in.” Rush was scared, so she played along and said what defendant told her to say. She then felt faint and fell to the ground.
 

 Defendant started kicking Rush and said, “Get up b.tch, you’re a dead b.tch ... I told you I’d kill you, you b.tch.” After-wards, she looked around and did not see him, but saw that the door was open. Rush ran out the door toward the motel office for help, but the office personnel told her to go away because they did not want any trouble. Rush thought she heard defendant hollering for her, so she hid underneath a truck next to the office. When she realized the “coast was clear,” she ran to a house near the motel to see if she could find someone to help her.
 

 Rush banged on the door, but the lady inside told her to go away because she did not want any trouble. Rush asked her to call the police. She then ran down the block and eventually knocked on the door of a house at 220 Carnation Street. Matthew Grass, the owner of the house, came outside, and she told him that her boyfriend was trying to kill her and that she needed help. Grass told her to calm down. He took out his gun and said that no one was going to come on his porch and hurt her.
 

 At approximately 3:10 a.m., the police received two 911 calls advising them that a topless, bloody white female was running around the area of Finch and Carnation Streets banging on doors. Deputy Ruth Eddy of the Jefferson Parish Sheriffs Office (JPSO) arrived at 220 Carnation Street and observed Rush on the ground completely covered in blood with obvious stab wounds and screaming | ¡¡hysterically. Rush was very afraid because she thought defendant was chasing her. Rush told the officer that defendant was responsible for her injuries and that he could be located at the Deep South Motel, Room 12. Deputy
 
 *712
 
 Eddy told other officers to go to that location to find the suspect.
 

 Officers Michael Nicolini and John James and Sergeant James Wine went to the motel. The doorway to Room 12 had blood on the outside of it, and the door was slightly ajar. Deputy Eddy, Officer Nicol-ini, and Sergeant Wine saw a male subject, later identified as defendant, lying face down on the bed inside the room. The officers pushed the door open, went inside with their guns drawn, and told defendant to lie on the floor. Defendant initially hesitated, but then complied with the officers’ command.
 

 The officers observed a large amount of blood all over the walls and could tell that a struggle had taken place. The mattresses were flipped over, and there was clothing and belongings all over the place. Defendant was sweating and had blood all over his clothing. The officers searched the room and found a knife in the bathroom on the sink behind the faucet. They arrested defendant and advised him of his rights, and defendant waived them and gave a statement.
 

 In his statement, defendant said that he and Rush had started drinking and smoking crack cocaine a few days before, and that they went to the motel to spend the night. He stated that a “black dude” showed up and that they smoked “dope” with him. Afterwards, the “black dude” left, and he and Rush lay in the bed. Defendant heard someone knocking on the wall, and he jumped up. Rush then pounded on the wall and told “them” to leave. She told defendant not to worry about it, and then she hit him, and they started fighting. Defendant claimed Rush had a knife in her hand and tried to cut him with it, and they fought over the knife. He explained that they were throwing each other all over the room, and that she | (;may have been cut with the knife during the fight. Defendant said that Rush fell and dropped the knife and that he picked it up and threw it, and Rush ran out the door.
 

 While the officers investigated the incident, Rush was taken to the emergency room at East Jefferson General Hospital where she was treated for her injuries. When Rush arrived, she was brought to the most critical resuscitation room where people are either in the process of dying or at risk of dying based on their injuries or illnesses. Rush had a wound a few inches long to the top of her head, a two inch wound to the left side of her neck, a three inch wound to her left chest, a two inch wound to the right chest, a deep wound to her left hand between the thumb and index finger, three more wounds on that hand, a large wound to the lateral part of her right leg, bruising to the armpit area and chest, a broken nose, and a bruised and swollen nose and lips. Most of her wounds were penetrating wounds caused by a knife or sharp instrument. Rush had to have a blood transfusion during her hospital stay, which lasted a week and a half.
 

 The morning after the incident, Rush’s children went back to Room 12 at the motel and found another knife in a drawer. Approximately seven months later, Rush turned that knife over to Sergeant Al West along with a handwritten letter from defendant to Rush dated November 3, 2006. Rush maintained that the knife her children found was not the knife defendant used to stab her.
 

 Also after the incident, Rush received several handwritten letters from defendant dated May of 2006. In those letters, defendant apologized and expressed remorse for what happened on the night of the incident. He indicated that the incident was a “drug event” that would never be repeated, and he admitted that she almost died because of his actions “on that drug.” He asked her to get him out of |7jail, and
 
 *713
 
 he talked about the money she had received in a settlement. He noted that she would not have to testify against him if she married him.
 

 Robert Foley, an expert forensic document examiner, compared the letters Rush received from defendant to defendant’s handwriting sample and concluded that defendant wrote the letters to Rush.
 

 Christine Kogos, an employee of the JPSO crime lab, conducted a preliminary test on the two knives found at the crime scene and the shorts and t-shirt defendant was wearing at the time of the incident. The preliminary test on the shorts and t-shirt and on the knife found by the officers at the crime scene (not the one found by Rush’s children) was positive for blood.
 

 Bonnie Dubourg, an expert forensic DNA analyst, conducted DNA tests on swabbings from the two knives found at the crime scene, the wall of Room 12, and defendant’s shorts and t-shirt. The test results for the swabbings from the knife found by the officers at the crime scene, the wall of Room 12, and defendant’s shorts and t-shirt were consistent with the reference buccal swab from Rush.
 

 After the State rested its case, defendant presented the jury with a different version of the incident. He contended that at 11:00 p.m. on the night in question, he left the motel room and went to St. John Parish to buy drugs. When he returned at 1:00 a.m., he saw two black males in their late teens or early twenties exiting Room 12 and getting into their vehicle. Defendant exited his vehicle and walked to the doorway of the room. As he did so, he noticed that Rush was crying and bleeding from the nose. He physically moved her into the room so they would not draw any attention to themselves, since he had illegal narcotics in his possession.
 

 According to defendant, Rush was hysterical and angry, and she had a knife in her right hand. She screamed at defendant to “go get those guys.” Defendant took the knife from her and, when he did so, he saw that her hands were injured. | sOnce he got the knife from her, Rush tried to get it back. When she did so, she ran her hand onto the blade. He threw the knife under the dresser so she could not get to it. During the struggle, Rush was violently flailing herself around and against the wall. They rolled onto the bed and off the bed onto the floor.
 

 The struggle continued into the bathroom where Rush badly injured her head on the exposed fittings under the sink. Defendant claimed that Rush was determined to get out the door to find the two men who left. He did not know their identities or why she was after them. At approximately 1:30 a.m., Rush left the room fully clothed, and he sat down on the bed thinking she would return shortly. He then washed off the knife and after-wards, fell asleep. The police officers later woke him up and questioned him about the incident. Defendant gave a statement to the officers; however, he claimed at trial that the first part of the statement regarding smoking “dope” with a black man and hearing knocking on the wall was not his statement, and that only the bottom seven lines regarding the fight with the victim was his statement.
 

 Defendant testified at trial that he did not stab Rush or break her nose or beat her. He stated that he did not intend to harm her, and he did not tell the police or Rush (in the letters) that he had harmed her. He testified that he did not cause her injuries. When he looked at the photographs of Rush in the hospital, he claimed that she was not in that condition when she left the motel. He said that, when Rush left the room, she had a serious cut
 
 *714
 
 on her head and several wounds to her hand. He explained that, in his letters, he was only apologizing for having left her alone in the motel while he went to buy drugs and for accusing her of cheating on him.
 

 1 r,By his first assignment of error, defendant argues that the trial court erred by not suppressing his statement. He contends that he was incapable of understanding and signing a
 
 “Miranda
 
 warning” because he was under the influence of drugs and alcohol. He notes that he had been awake for several days, had been taking drugs, and was delusional. He further notes that the officers described him, in part, as a “doped-up, sleep-deprived, blood-splattered fiend.”
 

 The State responds that defendant was not under the influence of drugs or alcohol at the time of his waiver. Alternatively, the State argues that, if this Court finds that defendant was under the influence of drugs or alcohol, his drug-induced or intoxicated state was insufficient to vitiate the voluntariness of his statement.
 

 At the suppression hearing, Sergeant James Wine and Deputy Michael Nieolini testified that they approached Room 12 and saw that the door was ajar. When they looked inside they saw defendant lying on the bed, sweating profusely and panting and looking nervous and confused. Defendant was conscious and breathing and did not appear to be sleeping. He appeared to be “somewhat out of it,” but not to the degree of semi-consciousness.
 

 The officers entered the room and verbally advised defendant of his rights. They also advised him of his rights using a standardized rights of arrestee form. Defendant read that form and signed it on the line below the sentence, “This statement of my rights has been read to me by the undersigned Officer.” However, defendant did not sign the form under the section stating that he was waiving his rights and agreeing to give a statement.
 

 At the hearing, the officers explained that, although they neglected to have defendant sign under the “waiver of rights” section, it was a clerical error, and that defendant indicated to them verbally that he waived his rights and wanted to give a statement. The officers asserted that they did not threaten or coerce defendant into Imgiving a statement, nor did they promise him anything in return for one. Sergeant Wine testified that the statement was taken in the parking lot of the hotel and that it was freely and voluntarily given.
 

 Sergeant Wine and Deputy Nieolini testified that defendant admitted to them that he was under the influence of drugs or alcohol when he gave his statement. Defendant admitted to Sergeant Wine that he was smoking crack cocaine on the morning of the incident. Sergeant Wine testified that defendant appeared to be under the influence of drugs or alcohol, and Deputy Nieolini testified that defendant “possibly” appeared to be under the influence of narcotics. In his statement, defendant said that he and his girlfriend had started drinking and smoking crack “a few days ago,” and that they had smoked crack with a black male before the incident.
 

 Sergeant Wine and Deputy Nieolini testified that defendant was able to express clearly what happened that night and to adequately respond to their questioning, even though he may have been under the influence of drugs or alcohol at the time. They stated that defendant was able to provide personal information about himself such as his name, address, and education level, and the name of the victim. Sergeant Wine added that defendant was cognizant enough to give a statement that contradicted the victim’s version of events. (R., p. 116). Sergeant Wine also added
 
 *715
 
 that defendant did not pass out, request medical attention, nor require medical attention at the time.
 

 Defendant did not call any witnesses at the hearing.
 

 Following the testimony, defense counsel argued that the statement should be suppressed because defendant was clearly under the influence of some type of narcotic as evidenced by his incoherent signature on the rights of arrestee form. The prosecutor responded that, even though defendant may have been under the | n influence of a narcotic, he was still able to clearly give his version of the event and his personal information. He further responded that defendant did not ask for nor require medical attention. The prosecutor contended that defendant was lucid enough to understand and intelligently and knowingly waive his rights and give a statement of his version of the incident.
 

 After hearing arguments of counsel, the trial judge denied the motion to suppress, stating:
 

 Once they went in he was sweating. He was probably under the influence but according to both police officers, he was able to understand his rights. He was able to give them coherent answers to the questions that they had. He gave them the address where he lived, his education level, all of those kinds of things. They said they did the statement outside in the parking lot. You know, they might not have had a place to sign it. I don’t know. I can’t explain the signature. I don’t know what his real signature looks like, whether it’s close to that or not. But, I mean, there is nothing really to indicate to me that he was too far gone to understand his rights, and for that reason I am going to deny the motion to suppress the statement ...
 

 The State has the burden of affirmatively showing that a confession was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises before it may be admitted into evidence.
 
 State v. Dewey,
 
 408 So.2d 1255, 1258 (La. 1982);
 
 State v. Batiste,
 
 06-824, p. 9 (La. App. 5 Cir. 3/13/07), 956 So.2d 626, 633,
 
 writ denied,
 
 07-0892 (La.1/25/08), 973 So.2d 751. If the statement was made during custodial interrogation, the State must also show that the defendant was advised of his constitutional rights.
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);
 
 State v. Brown,
 
 03-897, pp. 15-16 (La.4/12/05), 907 So.2d 1, 15. Whether a defendant’s purported waiver of
 
 Miranda
 
 rights was voluntary is determined by the totality of the circumstances.
 
 State v. Pugh,
 
 02-171, p. 11 (La.App. 5 Cir. 10/16/02), 831 So.2d 341, 352. The lack of a signed waiver of rights form does not, alone, require the suppression of a defendant’s confession.
 
 State v. Jenkins,
 
 02-161, p. 6 (La.App. 5 Cir. 9/30/03), 857 So.2d 1185, 1188,
 
 writ denied,
 
 04-2533 (La.11/28/05), 916 So.2d 130.
 

 Intoxication only renders a statement involuntary when the intoxication is of such a degree that it negates the defendant’s comprehension and renders him unconscious of the consequences of what he or she is saying.
 
 State v. Quest,
 
 00-205, p. 6 (La.App. 5 Cir. 10/18/00), 772 So.2d 772, 780,
 
 writ denied,
 
 00-3137 (La.11/2/01), 800 So.2d 866. A determination of whether the intoxication existed and was of a degree sufficient to vitiate the voluntariness of the defendant’s confession are questions of fact to be determined by the trial court.
 
 Id.
 
 The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the
 
 *716
 
 statement.
 
 State v. Pugh,
 
 02-171 at 19, 831 So.2d at 353.
 

 A trial court’s determination on the admissibility and its conclusions on the credibility and weight of the testimony relating to the voluntariness of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 State v. Batiste,
 
 06-824 at 10, 956 So.2d at 634. A trial court’s determination on the motion to suppress should not be disturbed on appeal, unless it is clearly wrong.
 
 State v. Massey,
 
 02-872, p. 3 (La.App. 5 Cir. 2/11/03), 841 So.2d 862, 864,
 
 writ denied,
 
 03-805 (La.10/17/03), 855 So.2d 758.
 

 In
 
 State v. Scott,
 
 06-134 (La.App. 5 Cir. 7/25/06), 939 So.2d 462,
 
 writ denied,
 
 06-2133 (La.3/30/07), 953 So.2d 61, defendant argued that his statement was involuntary because he was taking pain medication. This Court noted that defendant never claimed his medication impaired his ability to understand his rights, and at no time did defendant claim he did not understand his rights. This Court found that defendant’s statement showed he was coherent and appropriately | ^answered the questions asked and that nothing in the record suggested defendant’s medication resulted in incapacitating intoxication that would vitiate the voluntariness of his confession. As such, this Court found that defendant’s statement was freely and voluntarily given and, therefore, the trial court did not abuse its discretion by denying his motion to suppress statement.
 
 Id.,
 
 06-134 at 11-12, 939 So.2d at 469-70.
 

 In the instant case, the testimony of the officers at the suppression hearing reflects that defendant was advised of his
 
 Miranda
 
 rights and then waived them. The testimony also indicates that defendant’s statements were made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. Although it appears that defendant was under the influence of crack cocaine when he waived his rights and gave a statement, as in
 
 Scott,
 
 he never claimed that the drug impaired his ability to understand his rights, and he never claimed he did not understand his rights. Also as in
 
 Scott,
 
 defendant’s statement shows that he was coherent and appropriately answered the questions asked, even providing an exculpatory version of the incident. As such, the record fails to show that the influence of the drug was of such a degree that it negated defendant’s comprehension and rendered him unconscious of the consequences of what he was saying.
 
 Quest, supra.
 

 In light of the foregoing, we find that the trial court did not abuse its discretion by denying defendant’s motion to suppress the statement.
 

 By his next assignment, defendant contends the trial court abused its discretion in allowing the State to introduce cumulative and gruesome photographs of the victim and the scene. He argues that the prejudicial effect of the photographs outweighed their probative value.
 

 |uThe State responds that defendant did not object to photographs of the motel room scene and, therefore, he has waived this claim; however, the State notes that defendant objected to photographs of the victim in the hospital.
 

 At trial, Deputy Ruth Eddy testified that she arranged for a crime scene technician to photograph the fronts of the houses where the victim went for help and to photograph the motel room where the incident occurred. She testified that those photographs accurately depicted the appearance of those houses and the motel room on April 16th. Sergeant James Wine also testified that the State’s exhibits accu
 
 *717
 
 rately depicted the condition of the motel room on April 16th.
 

 Charlotte Rush, the victim, testified that she recognized what was being depicted in the photographs submitted by the State. The prosecutor offered them into evidence and asked that they be published to the jury. Defense counsel objected to the victim being able to describe them. He argued that, “They’re pictures. They stand for themselves.” The prosecutor said that she wanted the victim to explain where in the room the attack occurred. The trial judge ruled that she was going to allow it, and she admitted State’s exhibits into evidence. The victim proceeded to describe the attack with use of the photographs. She later identified photographs of the first and second house she went to for help.
 

 The victim also identified photographs of her injuries taken in the hospital after the attack. The prosecutor offered them into evidence and asked that they be published to the jury. Defense counsel objected, arguing that they were unduly prejudicial. The prosecutor responded that this was an attempted murder charge, and she had to prove that defendant tried to kill the victim. She also responded that it was crucial to her case that the jury be allowed to see the areas of the victim’s body that were injured.
 

 1 ^Defense counsel noted that the prosecutor was going to call the doctor to testify the next day, but the prosecutor said that the best evidence was “what they can see.” The trial judge admitted the photographs into evidence, stating, “They depict what they are supposed to depict. I think it’s important for them to see.” Defense counsel noted his objection. Afterwards, the trial judge asked the prosecutor if she wanted to also admit the photographs of the first house the victim went to for help. When the prosecutor answered affirmatively, the trial judge asked defense counsel if he had any objections, and he said, “no.” Matthew Grass testified that the photographs submitted by the State accurately reflected the condition of his front porch before he cleaned it on April 16th. During Grass’ testimony, these photographs were admitted into evidence without objection by defense counsel, and they were published to the jury.
 

 The record indicates that defendant failed to object to the introduction of the photographs of the houses where the victim went for help and the motel room where the incident occurred. With respect to photographs of the motel room, he only objected to the victim being able to describe what was in them. In order to preserve the right to seek appellate review of an alleged trial court error, the party alleging the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. LSA-C.Cr.P. art. 841;
 
 State v. Gaal,
 
 01-376, p. 17 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949,
 
 writ denied,
 
 02-2335 (La.10/3/03), 855 So.2d 294. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant.
 
 Id.
 
 A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection 11f,may not be raised for the first time on appeal.
 
 State v. Taylor,
 
 04-346, p. 9 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 594.
 

 Since defendant did not object to the photographs of the houses where the victim went to get help or of the motel room where the incident occurred, the argument pertaining to those photographs is not properly before this Court for review. However, defendant did object to the pho
 
 *718
 
 tographs of the victim taken in the hospital after the attack as being unduly prejudicial. Therefore, we will address the issue regarding whether the trial court erred by admitting those photographs.
 

 Under LSA-C.E. art. 408, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...” The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters.
 
 State v. Lane,
 
 414 So.2d 1223, 1227 (La.1982);
 
 State v. Battaglia, 03-
 
 692, p. 10 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 711,
 
 writ denied,
 
 04-1701 (La.4/29/05), 901 So.2d 1058. “The trial court has considerable discretion in the admission of photographs [and] its ruling will not be disturbed in the absence of an abuse of that discretion.”
 
 State v. Gallow,
 
 338 So.2d 920, 923 (La.1976).
 

 Generally, photographs are admissible if they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, subject to the test that their probative value outweighs any prejudicial effect.
 
 State v. Battaglia,
 
 03-692 at 10, 861 So.2d at 719. It is well-settled that a trial court’s ruling with respect to the admissibility of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the evidence outweighs its probative value.
 
 State v. Maxie,
 
 93-2158, p. 11 (La.4/10/95), 653 So.2d 526, 532 n. 8.
 

 117Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors’ reason and lead them to convict the defendant without sufficient evidence.
 
 State v. Broaden,
 
 99-2124, p. 23 (La.2/21/01), 780 So.2d 349, 364,
 
 cert. denied,
 
 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001);
 
 State v. Jones,
 
 99-798, p. 7 (La.App. 5 Cir. 11/10/99), 748 So.2d 1176, 1179,
 
 writ denied,
 
 00-0306 (La.12/8/00), 775 So.2d 1076.
 

 In the instant case, although the photographs of the victim’s injuries taken at the hospital are disturbing, they depict the injuries sustained by the victim and do not appear to be so gruesome that they would have overwhelmed the jurors’ reason and led them to convict defendant based upon the photographs alone. As was noted by the prosecutor at trial, defendant was charged with attempted second degree murder. Therefore, the State had the burden of proving that defendant had the specific intent to kill or to inflict great bodily harm. Further, the photographs corroborate the testimony of the victim, the officers, and the doctor regarding the victim’s injuries.
 

 Additionally, although some of the photographs depict the same injury, they do not appear to be cumulative. Some of the photographs show close-up and faraway views of the same injuries, and others show the injuries from different angles with rulers next to them indicating their size. Accordingly, defendant has failed to show that the photographs were more prejudicial than probative and that this Court should interfere in the trial court’s discretion to admit the evidence.
 

 In light of the foregoing, we fail to find that the trial court abused its discretion by admitting into evidence the photographs of the victim’s injuries taken at the hospital and publishing them to the jury.
 

 [ jgDefendant next argues that his trial counsel was ineffective for failing to present a handwriting expert to corroborate his assertion that he had not signed the
 
 Miranda
 
 waiver. He also argues that his trial counsel was ineffective for failing to object to the introduction of photographs of the motel room splattered in
 
 *719
 
 blood. He contends that it is reasonably probable that the jury may have reacted differently if the photographs of the motel room had been excluded, and if a handwriting expert had cast doubt on the authenticity of the signature on the waiver form.
 

 The State responds that the issues should be addressed in the district court because the record is not sufficient to decide them. Alternatively, the State argues that defendant did not need to present a handwriting expert, since he only signed the rights of arrestee or suspect form and not the
 
 Miranda
 
 waiver. The State also argues that there was no legal basis for objecting to the photographs of the motel room, as they were necessary to show defendant’s intent to kill the victim or to inflict great bodily harm upon her, and to impeach defendant’s statement to the police that the victim was wielding the knife, and not him. Finally, the State asserts that defendant has not shown a reasonable probability that the results of the trial would have been different, but for counsel’s alleged unprofessional conduct.
 

 A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. Courts apply a two-pronged test in assessing a claim of ineffective counsel. A defendant must show his attorney’s performance was deficient and that the deficiency prejudiced him.
 
 Strickland v. Washington,
 
 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984);
 
 State v. Soler,
 
 93-1042, p. 9 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075,
 
 writs denied,
 
 94-0475 (La.4/4/94), 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055. An error is prejudicial if it was so serious that it deprived the defendant of a fair trial, or “a trial whose result is reliable.”
 
 Strickland, supra; State v. Serio,
 
 94-131, p. 4 (La.App. 5 Cir. 7/1/94), 641 So.2d 604, 607,
 
 writ denied,
 
 94-2025 (La.12/16/94), 648 So.2d 388. In order to show prejudice, a defendant must demonstrate that but for counsel’s unprofessional conduct, the outcome of the trial would have been different.
 
 Strickland v. Washington,
 
 466 U.S. at 694, 104 S.Ct. at 2068;
 
 State v. Soler, supra.
 

 The Sixth Amendment does not guarantee a defendant errorless counsel or counsel judged ineffective by hindsight.
 
 State v. LaCaze,
 
 99-0584, p. 20 (La.1/25/02), 824 So.2d 1063, 1078,
 
 cert. denied,
 
 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002)). Ineffective assistance claims are assessed on the facts of the particular case as seen from the counsel’s perspective at the time.
 
 Id.,
 
 99-0584 at 20, 824 So.2d at 1078-79. As such, there is a strong presumption that counsel’s conduct will fall within the wide range of reasonable professional assistance.
 
 Id.,
 
 99-0584 at 20, 824 So.2d at 1079.
 

 Claims for ineffective assistance of counsel are most appropriately addressed through application for post-conviction relief in order to afford the parties an adequate record for review.
 
 State v. Williams,
 
 00-1850, p. 8 (La.App. 5 Cir. 4/11/01), 786 So.2d 785, 793,
 
 writ denied,
 
 01-1432 (La.4/12/02), 812 So.2d 666. But an appellate court can address the issues if the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal.
 
 State v. Pendelton,
 
 00-1211, p. 10 (La.App. 5 Cir. 3/14/01), 783 So.2d 459, 465-66,
 
 writ denied,
 
 01-1242 (La.1/25/02), 807 So.2d 243. In this case, we find that the record contains sufficient evidence to decide whether trial counsel was |2nineffective for failing to call a handwriting expert and for failing to object to certain photographs.
 

 
 *720
 

 Handwriting expert
 

 Defendant argues that his trial counsel was ineffective for failing to present a handwriting expert to corroborate his assertion that he had not signed the
 
 Miranda
 
 waiver. He contends that it is reasonably probable that the jury may have reacted differently if a handwriting expert had cast doubt on the authenticity of the signature on the waiver form.
 

 At trial, Deputy Nicolini testified that he witnessed defendant sign the rights of ar-restee form indicating that he had read his rights and that his rights had been read to him by the officer. Deputy Nicolini further testified that defendant did not sign the section of the form regarding the waiver of rights. He explained that it was a clerical error and that defendant verbally indicated to them that he wanted to waive his rights and give a statement. Defendant, on the other hand, testified at trial that he did not sign the rights of arrestee form and that the signature on that document was not his.
 

 In
 
 State v. Hoffman,
 
 98-3118 (La.4/11/00), 768 So.2d 542, defendant contended his counsel was deficient, in part, for failing to object to photographs and failing to present DNA evidence. The supreme court stated that, given that the arguments underlying the ineffective assistance claims had no merit, counsel committed no error in not proceeding differently. The supreme court noted that defendant had not overcome the strong presumption that counsel’s actions might be considered sound trial strategy, and it indicated that it would not second-guess strategic and tactical choices made by trial counsel. The supreme court found that defendant had not demonstrated that counsel’s performance rendered his trial I?, unfair or that the result was unreliable and, therefore, the assignment had no merit.
 
 Id.,
 
 98-3118 at 40, 768 So.2d at 579.
 

 In the instant case, we find that defendant did not need an expert to say that he did not sign the waiver of rights form, because he, in fact, did not sign it. He only signed the section that stated he had read the statement of his rights. Given that the argument underlying this ineffectiveness claim has no merit, we find that counsel committed no error in not proceeding differently.
 
 Hoffman, supra.
 
 In light of this situation, we will not second-guess the strategic and tactical choices made by trial counsel.
 
 Id.
 
 We further find that defendant has not demonstrated that counsel’s performance rendered his trial unfair or that the result was unreliable.
 

 Photographs
 

 Defendant argues that his trial counsel was ineffective for failing to object to the introduction of photographs of the motel room splattered in blood. He contends that it is reasonably probable that the jury may have reacted differently if the photographs of the motel room had been excluded.
 

 After review of the record, we find that defendant’s trial counsel was not ineffective for failing to object to photographs of the motel room because there was no legal basis for an objection. The photographs of the motel room were relevant to prove that defendant had the specific intent to kill the victim or to inflict great bodily harm upon her, since he was charged with attempted second degree murder. They were also relevant to impeach defendant’s statement to the police, wherein he claimed that the victim had the knife in her hand, and not him, and that the victim did not sustain most of her injuries in the motel room.
 

 Additionally, during cross-examination of the victim, defense counsel showed the victim photographs of the motel room and the houses where she wentj^for help and, in fact, marked many of them as his exhib
 
 *721
 
 its. He used the photographs of the poor condition of the motel room to suggest that she was addicted to crack cocaine. He also used a photograph of defendant standing in front of the motel room that showed no blood on the ground to imply that she was not severely injured when she left that room. Defense counsel clearly used the photographs of the motel room in order to defend his client. As such, we find that defendant’s trial counsel was not ineffective for failing to object to them, as they were part of his trial strategy.
 
 [2]
 

 Based on the allegations made on appeal and a review of the entire record, we find that defendant has not shown that his attorney’s performance fell below an objective standard of reasonableness under prevailing professional norms or that counsel’s errors or omissions resulted in prejudice so great as to undermine confidence in the outcome of the trial. On the contrary, defendant’s trial counsel was able to win a lesser verdict on the attempted second degree murder charge, despite the fact that the State produced considerable evidence against defendant.
 

 In a supplemental assignment, defendant argues that the trial court erred by denying him the opportunity to question a juror who may have seen him in handcuffs and by adding comments, which amounted to her own testimony. He requests a remand for a hearing so he can question the juror and the judge regarding this issue. The State responds that defendant has not shown any prejudice nor given any evidence that the juror did in fact see defendant allegedly handcuffed.
 

 On the first day of trial, before any witnesses were called, the following bench conference was held:
 

 |23MR. WILLIAMS (Defense counsel):
 

 Your Honor, I spoke to my client. He says that the first person in probably saw him with handcuffs on, because he came in and he saw him being uncuffed by the deputy.
 

 THE COURT:
 

 I was watching and I could see and they weren’t looking in that direction. MR. WILLIAMS:
 

 All right. I just wanted to state it, Your Honor.
 

 THE COURT:
 

 I was looking. They weren’t. Okay.
 

 Defendant subsequently filed a motion for a new trial stating that during the course of the trial, during a lunch break, juror Margaret LeBlanc saw defendant handcuffed while being escorted from the courtroom by deputies from the Jefferson Parish Sheriffs Office. He argued that he was prejudiced as a result. At the hearing on the motion, the trial judge said that she had already addressed that issue during the trial, so she was going to deny the motion. Defense counsel noted his objection.
 

 Ordinarily, a defendant should not be shackled, handcuffed or garbed in any manner destructive of the presumption of his innocence and of the dignity and impartiality of judicial proceedings.
 
 State v. Wilkerson,
 
 403 So.2d 652, 659 (La.1981). However, exceptional circumstances may require, within the discretion of the trial court, the restraint of the prisoner for reasons of courtroom security or order or where the prisoner’s past conduct reasonably justifies apprehension that he may attempt to escape.
 
 Id.
 
 If the handcuffing
 
 *722
 
 is objected to at the time of trial, for a finding of reversible error, the record must show an abuse of the trial court’s reasonable discretion resulting in clear prejudice to the accused.
 
 Id.
 

 In
 
 State v. Logan,
 
 07-739, p. 22 (La. App. 5 Cir. 5/27/08), 986 So.2d 772, 786, the defendant filed a motion for new trial arguing that his right to due process was violated when a juror viewed him wearing shackles during trial. A deputy testified at the hearing that a juror may have seen the defendant in shackles while he was being transported from the courtroom to the jail.
 
 Id.
 
 The juror did not testify at the hearing.
 
 Id.,
 
 07-739 at 24, 986 So.2d at 787. This Court stated that it failed to find that the trial court abused its discretion by denying the motion for new trial on the basis of one juror inadvertently observing the defendant in shackles and handcuffs.
 
 Id.,
 
 07-739 at 27, 986 So.2d at 788-89. This Court noted that the defendant was only shackled and handcuffed for purposes of transport to and from the courtroom, and not during the trial, and that the juror may not have seen the defendant in restraints.
 
 Id.,
 
 07-739 at 27, 986 So.2d at 789. This Court found that, even assuming the juror did see the defendant in restraints, the brief incident did not appear to have so prejudiced the defendant as to warrant relief on appeal.
 
 Id. See also, State v. Wilkerson,
 
 403 So.2d 652 (La.1981);
 
 State v. Johnson,
 
 94-1172 (La. App. 4 Cir. 12/15/94), 648 So.2d 43.
 

 In the instant case, defense counsel did not move for a mistrial when he first learned that a juror may have momentarily seen defendant in handcuffs. Additionally, defense counsel did not ask the trial judge for an opportunity to question the juror or other witnesses either at the time he first brought the matter to the court’s attention or at the hearing on the motion for new trial. Nevertheless, the jurisprudence suggests that the issue can be decided even without an evidentiary hearing.
 
 See Wilkerson, supra.
 
 As in
 
 Logan
 
 and
 
 Wilkerson,
 
 we find that defendant in the instant case was not handcuffed during the trial, but only for purposes of transport to and from the courtroom. Also as in
 
 Logan
 
 and
 
 Wilkerson,
 
 the juror in the instant case may not have seen defendant in handcuffs. Even 12sassuming that she did, that brief incident did not prejudice defendant so as to warrant relief on appeal.
 
 [3]
 

 Logan, supra; Wilkerson, supra.
 
 This assignment of error has no merit.
 

 Finally, the record in this case was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975); and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent that require corrective action. Accordingly, for the reasons assigned herein, the conviction of defendant, Lloyd Addison, is hereby affirmed.
 

 AFFIRMED.
 

 [1]
 

 . It is noted that, on November 9, 2007, the State filed a multiple bill alleging defendant to be a second felony offender, and defendant denied those allegations. On June 27, 2008, a multiple bill hearing was held after which the trial judge found defendant to be a second felony offender. The trial court vacated the original sentence and resentenced defendant to imprisonment at hard labor for 40 years without benefit of probation or suspension of sentence. Defendant filed a separate appeal regarding the multiple bill proceedings in case number 08-KA-680, which is a companion case on this Court’s docket.
 

 [2]
 

 .
 
 See State v. Broyard,
 
 00-2290, p. 14 (La.App. 4 Cir. 11/14/01), 802 So.2d 845, 855,
 
 writ denied,
 
 02-0178 (La. 11/27/02), 831 So.2d 275, where the Fourth Circuit found that defense counsel was not ineffective for failing to object to photographs, in part, because he later introduced the photographs himself in order to defend his client.
 

 [3]
 

 .
 
 See also State v. Jones,
 
 31,613, p. 23 (La. App. 2 Cir. 4/01/99), 733 So.2d 127, 143,
 
 writ denied,
 
 99-1185 (La. 10/01/99), 748 So.2d 434, where the court found that the momentary use of restraints for the limited purpose of transporting the accused did not mandate a mistrial even if the juror saw the defendant being transported on two occasions. In that case, although evidentiary hearings were held to determine what the jurors may have seen, the trial judge did not allow the questioning of the jurors at either hearing.
 
 Id.,
 
 31,613 at 20, 733 So.2d at 142.